[No. S042831. Aug. 31, 1995.]

FREEMAN & MILLS, INCORPORATED, Plaintiff and Appellant, v.
BELCHER OIL COMPANY, Defendant and Appellant.

### COUNSEL

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, John M. Rochefort, Martha S. Doty, Saman Zia-Zarifi and Andrew M. Gilford for Plaintiff and Appellant.

Ian Herzog, Douglas DeVries, Leonard Sacks, Bruce Broillet, Thomas Stolpman, Robert B. Steinberg, Roland Wrinkle, Gary Paul, Steven Kleifeld, Harvey Levine, Wayne McClean, William Turley, Rose, Klein & Marias, David A. Rosen, Miller, Starr & Regalia, Edmund L. Regalia, Bernard & Wood, David P. Bonaccorsi, Crowe & Day, J. Michael Crowe and Douglas L. Day as Amici Curiae on behalf of Plaintiff and Appellant.

Stanley E. Crawford, Jr., David A. Engels, Sands, Narwitz, Forgie, Leonard & Lerner and Arthur A. Leonard for Defendant and Appellant.

Horvitz & Levy, Ellis J. Horvitz, Lisa Perrochet, John A. Taylor, Jr., Tanke & Willemsen, Tony J. Tanke, Michael A. Willemsen, McCutchen, Doyle, Brown & Enersen, John R. Reese, Robert A. Lewis and William Carpenter as Amici Curiae on behalf of Defendant and Appellant.

### OPINION

**LUCAS, C. J.**—We granted review in this case to resolve some of the widespread confusion that has arisen regarding the application of our opinion in *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158] (*Seaman's*). We held in that case that a tort cause of action might lie "when, in addition to breaching the contract, [defendant] seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Id.* at p. 769.)

In the present case, the Court of Appeal reversed judgment for plaintiff and remanded the case for a limited retrial, but also suggested that "it is time for the Supreme Court to reexamine the tort of 'bad faith denial of contract.'" We agree, and proceed to do so here. As our order granting review stated, "the issue to be argued before this court is limited to whether, and under what circumstances, a party to a contract may recover in tort for another party's bad faith denial of the contract's existence."

▮ In light of certain developments occurring subsequent to *Seaman's* that call into question its continued validity, we find it appropriate to reexamine that decision. (See generally, *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*).) As will appear, we have concluded that the *Seaman's* court incorrectly recognized a tort cause of action based on the defendant's bad faith denial of the existence of a contract between the parties. That holding has been widely criticized by legal scholars, has caused considerable confusion among lower courts, and has been rejected by the courts of several other jurisdictions. These critics convincingly argue that the *Seaman's* decision is confusing and ambiguous, analytically flawed, and promotes questionable policy. After careful review of all the foregoing considerations, we conclude that our *Seaman's* holding should be overruled.

## I. *Facts*

We first review the underlying facts, taken largely from the Court of Appeal opinion herein. In June 1987, defendant Belcher Oil Company (Belcher Oil) retained the law firm of Morgan, Lewis & Bockius (Morgan) to defend it in a Florida lawsuit. Pursuant to a letter of understanding signed by Belcher Oil's general counsel (William Dunker) and a Morgan partner (Donald Smaltz), Belcher Oil was to pay for costs incurred on its behalf, including fees for accountants. In February 1988, after first obtaining Dunker's express authorization, Smaltz hired plaintiff, the accounting firm of Freeman & Mills, Incorporated (Freeman and Mills), to provide a financial analysis and litigation support for Belcher Oil in the Florida lawsuit.

In March, an engagement letter was signed by both Morgan and Freeman & Mills. At about this time, William Dunker left Belcher Oil and was replaced by Neil Bowman. In April 1988, Bowman became dissatisfied with Morgan's efforts and the lawyers were discharged. Bowman asked Morgan for a summary of the work performed by Freeman & Mills and, at the same time, directed Smaltz to have Freeman & Mills stop their work for Belcher Oil. Smaltz did as he was asked. Freeman & Mills's final statement was for $70,042.50 in fees, plus $7,495.63 for costs, a total of $77,538.13.

Freeman & Mills billed Morgan, but no payment was forthcoming. Freeman & Mills then billed Belcher Oil directly and, for about a year, sent monthly statements and regularly called Bowman about the bill, but no payment was forthcoming. In August 1989, Smaltz finally told Freeman & Mills that Belcher Oil refused to pay their bill. Freeman & Mills then wrote to Bowman asking that the matter be resolved. In September 1989, Bowman responded, complaining that Belcher Oil had not been consulted about the extent of Freeman & Mills's services and suggesting Freeman & Mills should look to Morgan for payment of whatever amounts were claimed due.

Ultimately, Freeman & Mills filed this action against Belcher Oil, alleging (in its second amended complaint) causes of action for breach of contract, "bad faith denial of contract," and quantum meruit. Belcher Oil answered and the case was presented to a jury in a bifurcated trial, with punitive damages reserved for the second phase. According to the evidence presented during the first phase, the amount owed to Freeman & Mills (as indicated on their statements) was $77,538.13.

The jury returned its first phase verdict. On Freeman & Mills's breach of contract claim, the jury found that Belcher Oil had authorized Morgan to retain Freeman & Mills on Belcher Oil's behalf, that Freeman & Mills had performed its obligations under the contract, that Belcher Oil had breached the contract, and that the amount of damages suffered by Freeman & Mills was $25,000. The jury also answered affirmatively the questions about whether Belcher Oil had denied the existence of the contract and had acted with oppression, fraud, or malice. Thereafter, the jury returned its verdict awarding $477,538.13 in punitive damages and judgment was entered consistent with the jury's verdicts.

In three post-trial motions, Freeman & Mills asked for orders (1) "correcting" the jury's verdicts and the court's judgment to reflect compensatory damages of $77,538.13 and punitive damages of $425,000 (on the ground that the jury's questions showed this was its true intent); (2) awarding attorney fees as sanctions for the litigation tactics of Belcher Oil's attorneys; and (3) awarding prejudgment interest on the compensatory damage award. Over Belcher Oil's opposition, all three motions were granted—but with some changes in the course of correcting the judgment—by giving Freeman & Mills $131,614.93 in compensatory damages (the $25,000 actually awarded by the jury, plus the $77,538.13 included in the punitive damage award, plus $29,076.80 for prejudgment interest), and $400,000 (not $425,000 as requested) in punitive damages.

Belcher Oil appealed from the "corrected" judgment. Freeman & Mills cross-appealed from a mid-trial order denying its request to amend its

complaint to add a cause of action for fraud, an issue not presently before us. The Court of Appeal majority, finding no "special relationship" between the parties to justify a tort theory of recovery under *Seaman's*, reversed the judgment and remanded the case to the trial court for a retrial limited to the issue of damages under plaintiff's breach of contract cause of action. (The Court of Appeal dissenting justice would have sustained the tort cause of action and remanded for retrial of the damage issue as to both causes of action.) As will appear, we affirm the judgment of the Court of Appeal, concluding that a tort recovery is unavailable in this case.

## II. *The Seaman's Decision*

The tort of bad faith "denial of contract" was established in a per curiam opinion in *Seaman's, supra*, 36 Cal.3d 752. These were the facts before the court in that case: In 1971, Seaman's Direct Buying Service, a small marine fueling station in Eureka, wanted to expand its operation by developing a marine fuel dealership in conjunction with a new marina under development by the City of Eureka. When Seaman's approached the city about a long-term lease of a large parcel of land in the marina, the city required Seaman's to obtain a binding commitment from an oil supplier. To that end, Seaman's negotiated with several companies and, by 1972, reached a tentative agreement with Standard Oil Company of California.

Both Seaman's and Standard Oil signed a letter of intent setting forth the basic terms of their arrangement, but that letter was subject to government approval of the contract, continued approval of Seaman's credit status, and future agreement on specific arrangements. Seaman's showed the letter to the city and, shortly thereafter, signed a 40-year lease with the city. (*Seaman's, supra*, 36 Cal.3d at pp. 759-760.)

Shortly thereafter, an oil shortage dramatically reduced the available supplies of oil and, in November 1973, Standard Oil told Seaman's that new federal regulations requiring allocation of petroleum products to those that had been customers since 1972 precluded its execution of a new dealership agreement. In response, Seaman's obtained an exemption from the appropriate federal agency. Standard Oil appealed and persuaded the agency to reverse the order, but Seaman's eventually had the exemption reinstated contingent on a court determination that a valid contract existed between the parties. (36 Cal.3d at pp. 760-761.)

Seaman's then asked Standard Oil to stipulate to the existence of a contract, stating that a refusal would force it to discontinue operations. Standard Oil's representative refused the request, telling Seaman's, "See you

in court." Seaman's business collapsed and it sued Standard Oil for damages on four theories—breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, and interference with Seaman's contractual relationship with the city. (36 Cal.3d at pp. 761-762.)

The case was tried to a jury, which returned its verdicts in favor of Seaman's on all theories except fraud, awarding compensatory and punitive damages. Standard Oil appealed. (36 Cal.3d at p. 762.) We considered "whether, and under what circumstances, a breach of the implied covenant of good faith and fair dealing in a commercial contract may give rise to an action in tort." (*Id.* at p. 767.) For purposes of completeness, we quote from *Seaman's* at some length:

"It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. [Citations.] Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. [Citation.] [¶] California courts have recognized the existence of this covenant, and enforced it, in cases involving a wide variety of contracts. . . . [¶] In the seminal cases of *Comunale* v. *Traders & General Ins. Co.* [(1958)] 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883], and *Crisci* v. *Security Ins. Co.* [(1967)] 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173], this court held that a breach of the covenant of good faith and fair dealing by an insurance carrier may give rise to a cause of action in tort as well as in contract. [Citation.]

"While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's—that breach of the covenant always gives rise to an action in tort—is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. [Citation.] No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.

"When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured. In such

contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application.

"For the purposes of this case it is unnecessary to decide the broad question which Seaman's poses. Indeed, it is not even necessary to predicate liability on a breach of the implied covenant. It is sufficient to recognize that *a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.* [Italics added.]

"It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made ' "without probable cause and with no belief in the existence of the cause of action." ' [Citation.] There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. [Citation.] Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expectations of the contracting parties." (*Seaman's, supra,* 36 Cal.3d at pp. 768-770, fns. omitted.)

*Seaman's* concluded that, because a *good faith* denial of the existence of a binding contract is not a tort (*Seaman's, supra,* 36 Cal.3d at p. 770), the trial court's failure to instruct the jury on the requirement of *bad faith* was error (*ibid.*) and that error was prejudicial (*id.* at p. 774).

### III. *Stare Decisis*

Before examining various recent developments pertinent to our reconsideration of *Seaman's,* we briefly review certain well-established principles governing the respect we confer upon prior opinions of this court. These principles were summarized in *Moradi-Shalal, supra,* 46 Cal.3d 287, as follows:

■ ". . . It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This

policy, known as the doctrine of stare decisis, 'is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system; i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law.' (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 758, at p. 726, and see cases cited.)

"It is likewise well established, however, that the foregoing policy is sufficiently flexible to permit this court to reconsider, and ultimately to depart from, its own prior precedent in an appropriate case. (*Id.*, § 759, and cases cited.) As we stated in *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 924, . . . '[a]lthough the doctrine [stare decisis] does indeed serve important values, it nevertheless should not shield court-created error from correction.' (Accord, *People* v. *Guerrero* (1988) 44 Cal.3d 343, 356, . . . ; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147, . . . ; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 679, . . . .) In *Anderson*, Justice Mosk noted the need for flexibility in applying stare decisis, stating, 'This is especially so when, as here, the error [in the prior opinion] is related to a "matter of continuing concern" to the community at large. [Citations.]' (*Anderson*, *supra*, 43 Cal.3d at p. 1147, . . . ; see also *Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658, 695, . . . [stare decisis not mechanically applied to prohibit overruling prior decisions interpreting statutes].)

"*Anderson* also recognized that reexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound, or has become ripe for reconsideration. [Citation.]" (*Moradi-Shalal*, *supra*, 46 Cal.3d at pp. 296-297; see also *People* v. *Latimer* (1993) 5 Cal.4th 1203,1212-1216 [23 Cal.Rptr.2d 144, 858 P.2d 611], and cases cited.)

As we explain below, developments occurring subsequent to the *Seaman's* decision convince us that it was incorrectly decided, that it has generated unnecessary confusion, costly litigation, and inequitable results, and that it will continue to produce such effects unless and until we overrule it.

IV. *Subsequent Developments*

A. *California Supreme Court Decisions*—Subsequent opinions of this court indicate a continuing reluctance, originally reflected in *Seaman's* itself, to authorize tort recovery for noninsurance contract breaches.

In *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), we considered the availability of tort damages

for the wrongful termination of a discharged employee. Declining to rely on dictum in *Seaman's* (see *id.* at p. 769 & fn. 6) regarding the possible availability of tort remedies for breach of the implied covenant of good faith and fair dealing (hereafter the implied covenant) in the employment context, we refused to afford such remedies for the essentially contractual claim of breach of the implied covenant arising in that context. (See *Foley, supra,* 47 Cal.3d at pp. 683-693.)

In reaching our conclusion in *Foley,* we relied in part on certain basic principles relevant to contract law, including the need for "predictability about the cost of contractual relationships," and the purpose of contract damages to compensate the injured party rather than punish the breaching party. (47 Cal.3d at p. 683.) Focusing on the implied covenant, we observed that, with the exception of insurance contracts, "[b]ecause the covenant is a contract term, . . . compensation for its breach has almost always been limited to contract rather than tort remedies." (*Id.* at p. 684.)

We acknowledged in *Foley* that "[t]he insurance cases . . . were a major departure from traditional principles of contract law," and we stressed that the courts should take "great care" before extending "the exceptional approach taken in those cases" to "another contract setting." (47 Cal.3d at p. 690.) We concluded that "the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies . . . ." (*Id.* at p. 693.)

Thereafter, in *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1180-1182 [26 Cal.Rptr.2d 8, 864 P.2d 88] (*Hunter*), we held that *Foley's* analysis would preclude recovery of tort damages for employer misrepresentations made to induce termination of employment. In the course of our analysis, and without mentioning *Seaman's,* we nonetheless confirmed that, with the exception of insurance contracts, remedies for breach of the implied covenant "have almost always been limited to contract damages." (6 Cal.4th at p. 1180.)

We reasoned in *Hunter* that the defendant's misrepresentations were "merely the means to the end desired by the employer, i.e., termination of employment. They cannot serve as a predicate for tort damages . . . ." (*Hunter, supra,* 6 Cal.4th at p. 1185.) Similar analysis would apply to a defendant's denial of the existence of the underlying contract. Although such "stonewalling" conduct may have been intended to terminate the contractual relationship, there is no logical reason why it should serve as a predicate for tort damages.

Most recently, in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied*

*Equipment*), we held that a contracting party may not be held liable in tort for conspiring with another to interfere with his own contract. We reiterated the important differences between contract and tort theories of recovery, stating that "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law" (*id.* at p. 515), and that "the law generally does not distinguish between good and bad motives for breaching a contract" (*id.* at p. 516). We noted that limiting contract breach damages to those within the reasonably foreseeable contemplation of the parties when the contract was formed "serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Id.* at p. 515.)

Our decisions in *Foley, Hunter,* and *Applied Equipment* each contains language that strongly suggests courts should limit tort recovery in contract breach situations to the insurance area, at least in the absence of violation of an independent duty arising from principles of tort law other than denial of the existence of, or liability under, the breached contract. (See also *White* v. *Western Title Ins. Co.* (1985) 40 Cal.3d 870, 901 [221 Cal.Rptr. 509, 710 P.2d 309] (conc. and dis. opn. of Kaus, J.) [observing that "our experience in *Seaman's* surely tells us that there are real problems in applying the substitute remedy of a tort recovery—with or without punitive damages—outside the insurance area," and urging a legislative solution].)

B. *Court of Appeal Decisions*—Subsequent decisions of the Courts of Appeal have encountered considerable difficulty in applying our *Seaman's* decision. As one recent commentary stated, "The *Seaman's* tort has generated confusion among California courts. Consequently, in recent decisions, almost every court offers a different interpretation of the tort." (Comment, *California's Detortification of Contract Law: Is the Seaman's Tort Dead?* (1992) 26 Loyola L.A. L.Rev. 213, 223 (hereafter Detortification Comment).)

Without analyzing the particular facts of each case, it is sufficient to observe that our *Seaman's* holding has presented the lower courts with a number of unanswered questions, and that these courts have reached varying, and often inconsistent, conclusions in response. (See, e.g., *Harris* v. *Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 77-80 [17 Cal.Rptr.2d 649] (hereafter *Harris)* [reviewing cases and noting criticism of *Seaman's* for "singling out" one type of bad faith contract breach for tort damages]; *DuBarry Internat., Inc.* v. *Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 566-572 [282 Cal.Rptr. 181] (hereafter *DuBarry)* [reviewing conflicting cases and holding *Seaman's* requires actual denial of contract's existence rather than mere denial of contract *liability*]; *Copesky* v.

*Superior Court* (1991) 229 Cal.App.3d 678, 686-694 [280 Cal.Rptr. 338] [general review of cases]; *Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1397, fn. 22 [272 Cal.Rptr. 387] (hereafter *Careau*) [acknowledging "confusion and uncertainty" generated by *Seaman's*]; *Lynch & Freytag* v. *Cooper* (1990) 218 Cal.App.3d 603, 610-611 [267 Cal.Rptr. 189] (hereafter *Lynch & Freytag*) [ruling *Seaman's* inapplicable to denials of contract existence set forth in pleadings]; *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 824-826 [250 Cal.Rptr. 220] (hereafter *Okun*) [concluding that *Seaman's* tort is based on breach of implied covenant]; *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925, 937-940 [235 Cal.Rptr. 12] (hereafter *Multiplex*) [extending *Seaman's* to bad faith denial of *liability*]; *Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1170-1171 [226 Cal.Rptr. 820] [extending *Seaman's* to bad faith attempt to deprive employee of contractual benefits]; *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 890-892 [208 Cal.Rptr. 394] [noting uncertainties presented by *Seaman's*, including its application to bad faith disputes over contractual "terms and performance"]; *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109, 1118-1119 [207 Cal.Rptr. 123] [interpreting *Seaman's* as allowing tort action for breach of implied covenant in noninsurance cases].)

Several of the foregoing cases criticize our *Seaman's* holding, raise doubts as to its continued viability, or urge our reconsideration of that decision. (See *Harris, supra,* 14 Cal.App.4th at p. 79-82 [noting criticism and declining to extend *Seaman's* tort to contract breaches in violation of public policy]; *Careau, supra,* 222 Cal.App.3d at p. 1401, fn. 27 ["unfortunate" that *Seaman's* failed to explain or justify why tort liability could be imposed for bad faith denial of contract existence but not for bad faith assertion of other defenses]; *Lynch & Freytag, supra,* 218 Cal.App.3d at pp. 611 (maj. opn.) [observing that "[t]he contours of this new tort have perplexed the appellate courts almost from the day *Seaman's* was filed."], 616 (conc. opn. of Woods (Fred), J.) [stating that "[t]he general viability of *Seaman's* in view of *Foley* appears to be tenuous at best"]; *Okun, supra,* 203 Cal.App.3d at p. 826 ["we are of the view—as are many others—that the whole concept of tort liability in bad faith commercial litigation needs to be reexamined"].)

As these cases indicate, much confusion and conflict has arisen regarding the scope and application of our *Seaman's* holding. For example, does the *Seaman's* tort derive from breach of the implied covenant or from some other independent tort duty? (Compare *Okun, supra,* 203 Cal.App.3d at pp. 823-826, with *Quigley* v. *Pet, Inc., supra,* 162 Cal.App.3d at p. 890.) Does the *Seaman's* tort extend to a bad faith *denial of liability* under a contract, as well as denial of its existence? (Compare *DuBarry, supra,* 231 Cal.App.3d at

pp. 566-572, with *Multiplex, supra,* 189 Cal.App.3d at pp. 937-940.) Is a "special relationship" between the contracting parties a prerequisite to a *Seaman's* action? (Compare *Multiplex, supra,* 189 Cal.App.3d at p. 939, and *Quigley* v. *Pet, Inc., supra,* 162 Cal.App.3d at p. 890, with *Okun, supra,* 203 Cal.App.3d at pp. 823-826; see also *Air-Sea Forwarders, Inc.* v. *Air Asia Co., Ltd.* (9th Cir. 1989) 880 F.2d 176 [reviewing the conflicting cases].)

The foregoing "special relationship" conflict extends to the present case, for as previously noted, the Court of Appeal herein concluded that the *Seaman's* tort requires a showing of a special relationship between the parties. As the Court of Appeal stated, "Whatever need there may be to provide special remedies to cover special relationships, there is no similar need in routine business cases. For this reason, we believe our colleagues in Division Two were correct when they interpreted *Seaman's* narrowly, limiting the tort of bad faith denial of contract to the situations where, in addition to whatever other elements may be required (which depends on which case is cited), there is (1) a special relationship and (2) conduct extraneous to the contract (as there was in *Seaman's*). (*Okun* v. *Morton, supra,* 203 Cal.App.3d at pp. 823-826 . . . .) We also think it is time for the Supreme Court to grant review and resolve the conflict created by *Okun* on the one hand and the *Quigley* line of cases on the other."

Confusion and conflict alone might not justify a decision to abrogate *Seaman's*, for we could attempt to resolve all the uncertainties engendered by that decision. But there are additional considerations that convince us to forgo that predictably Herculean effort. Many of the pertinent Court of Appeal decisions recognize compelling *policy* reasons supporting the preclusion of tort remedies for contractual breaches outside the insurance context.

For example, in *DuBarry, supra,* 231 Cal.App.3d at page 569, the court refused to extend the *Seaman's* tort to bad faith *defenses* to contract claims. The court explained: "If the rule were otherwise, then any party attempting to defend a disputed contract claim would risk, at the very least, exposure to the imposition of tort damages and an expensive and time-consuming expansion of the litigation into an inquiry as to the motives and state of mind of the breaching party. The distinction between tort and contract actions, and their purposefully different measures of damages, would be blurred if not erased. The insult to commercial predictability and certainty would only be exceeded by the increased burden on the already overworked judicial system." (*Ibid.*) Many of these considerations are equally applicable to the *Seaman's* tort itself.

Similarly, in *Harris, supra,* 14 Cal.App.4th 70, the Court of Appeal denied a tort recovery for bad faith contract breach in violation of public policy.

The court elaborated on the applicable policy considerations as follows: "The traditional goal of contract remedies is compensation of the promisee for the loss resulting from the breach, not compulsion of the promisor to perform his promises. Therefore, 'willful' breaches have not been distinguished from other breaches. [Citation.] The restrictions on contract remedies serve purposes not found in tort law. They protect the parties' freedom to bargain over special risks and they promote contract formation by limiting liability to the value of the promise. This encourages efficient breaches, resulting in increased production of goods and services at lower cost to society. [Citation.] Because of these overriding policy considerations, the California Supreme Court has proceeded with caution in carving out exceptions to the traditional contract remedy restrictions. [Citations.]" (14 Cal.App.4th at p. 77.)

The *Harris* court set forth as reasons for denying tort recovery in contract breach cases (1) the different objectives underlying the remedies for tort and contract breach, (2) the importance of predictability in assuring commercial stability in contractual dealings, (3) the potential for converting every contract breach into a tort, with accompanying punitive damage recovery, and (4) the preference for legislative action in affording appropriate remedies. (*Harris, supra,* 14 Cal.App.4th at pp. 81-82; see also *Foley, supra,* 47 Cal.3d at pp. 683, 694, fn. 31, 696.)

As we shall see (pt. V., *post,* pp. 102-103), the foregoing policy considerations fully support our decision to overrule *Seaman's* rather than attempt to clarify its uncertain boundaries. (We observe that plaintiff has asked us to take judicial notice of certain records purportedly showing there were only a few jury *verdicts* involving *Seaman's* claims during the period from 1981 to 1994. Because jury verdicts are an inconclusive indicia of excessive *litigation,* and because defendant has raised some doubts regarding the accuracy and completeness of the submitted materials, the application for judicial notice is denied.)

C. *Criticism by Courts of Other Jurisdictions*

We decided *Seaman's* in 1984. Since then, courts of other jurisdictions have either criticized or declined to follow our *Seaman's* analysis. Of all the states, only Montana has recognized the tort of bad faith in typical arm's length commercial contracts, and recently even that state has qualified the tort by requiring a showing of a special relationship between the contracting parties. (See *Story* v. *Bozeman* (1990) 242 Mont. 436 [791 P.2d 767, 776]; see also Farnsworth, *Contracts Is Not Dead* (1992) 77 Cornell L.Rev. 1034, 1037; Macintosh, *Gilmore Spoke Too Soon: Contract Rises From the Ashes of*

*the Bad Faith Tort* (1994) 27 Loyola L.A. L.Rev. 483, 496-497, 500; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 235-236.)

Ninth Circuit Judge Kozinski expressed his candid criticism of *Seaman's* in a concurring opinion in *Oki America, Inc.* v. *Microtech Intern., Inc.* (9th Cir.1989) 872 F.2d 312, 314-317 (*Oki America*). Among other criticism, Judge Kozinski found the *Seaman's* holding unduly imprecise and confusing. As he stated, "It is impossible to draw a principled distinction between a tortious denial of a contract's existence and a permissible denial of liability under the terms of the contract. The test . . . seems to be whether the conduct 'offends accepted notions of business ethics.' [Citation.] This gives judges license to rely on their gut feelings in distinguishing between a squabble and a tort. As a result, both the commercial world and the courts are needlessly burdened . . . ." (*Oki America, supra*, 872 F.2d at p. 315.)

Judge Kozinski also mentioned the substantial costs associated with *Seaman's* litigation, and the resulting interference with contractual relationships. "Perhaps most troubling, the willingness of courts to subordinate voluntary contractual arrangements to their own sense of public policy and proper business decorum deprives individuals of an important measure of freedom. The right to enter into contracts—to adjust one's legal relationships by mutual agreement [] is too easily smothered by government officers eager to tell us what's best for us." (872 F.2d at p. 316.) Judge Kozinski concluded by observing that "*Seaman's* is a prime candidate for reconsideration." (*Id.* at p. 317.)

Similarly, in *Air-Sea Forwarders, Inc.* v. *Air Asia Co., Ltd., supra,* 880 F.2d at pages 184-185, Judge Hall observed that *Seaman's* "ambiguous" holding had caused widespread confusion among the lower courts. As Judge Hall stated, "Indeed, the *Seaman's* court's failure to explain *why* it was not necessary to predicate its holding on the implied covenant of good faith and fair dealing, or to *justify* the dramatically greater liability for the bad faith denial of the existence of a contract as compared to the bad faith dispute of a contract's terms, undoubtedly spawned the confusion in the appellate division cases discussed *infra*." (*Id.* at p. 184, fn. 11.)

Other federal courts have found similar difficulty interpreting and applying *Seaman's*. Thus, in *Elxsi* v. *Kukje America Corp.* (N.D.Cal. 1987) 672 F.Supp. 1294, 1296, Judge Aguilar observed: "The major difficulty confronting jurists and commentators trying to understand and apply *Seaman's* is the faithful interpretation of the . . . passage [condemning "stonewalling" "without probable cause and with no belief in the existence of a defense"]. The initial sentence . . . states that the new tort is denial of the existence

*of a contract,* while the subsequent passage describes denial of the *existence of liability.* Ultimately, the dilemma involves determining whether the subsequent passage is definitional or descriptive."

As we stated in *Moradi-Shalal, supra,* 46 Cal.3d 287, 298, in which we were faced with a similar tide of critical or contrary authority from other jurisdictions regarding one of our prior decisions, "[A]lthough holdings from other states are not controlling, and we remain free to steer a contrary course, nonetheless the near unanimity of agreement . . . indicates we should question the advisability of continued allegiance to our minority approach."

D. *Scholarly Criticism*

Scholarly commentary on *Seaman's* also has been generally critical of our *Seaman's* holding and underlying analysis. (See, e.g., Ashley, Bad Faith Actions; Liability and Damages (1994) § 11.08, at p. 28 [stating that the *Seaman's* court, in creating a new tort of "stonewalling" based on "inapposite" authority, "can only be described as out of balance," having "lost touch with the traditions of contract law"]; Putz & Klippen, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 459 (hereafter Putz & Klippen) [finding "no rational way" to distinguish denial of contract existence from other denials of liability]; Sebert, *Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 U.C.L.A. L.Rev. 1565, 1640-1641 (hereafter Sebert) stating that *Seaman's* is an "unhappy compromise" that is "both troubling and likely to be mischievous" by creating a "meaningless distinction" between denial of contract existence and other breaches]; Snyderman, *What's So Good About Good Faith? The Good Faith Performance Obligation in Commercial Lending* (1988) 55 U.Chi. L.Rev. 1335, 1363 (hereafter Snyderman) [stating that *Seaman's* "represents a potentially disastrous expansion of the bad faith tort into the commercial realm"]; Wallenstein, *Breach of the Implied Covenant of Good Faith and Fair Dealing in Commercial Contracts: A Wrong in Search of a Remedy* (1988-1989) 20 U. West L.A. L.Rev. 113, 124 ["[w]ith the advent of *Seaman's,* the root causes of the confusion surrounding the implied covenant in commercial contracts began to emerge"]; Comment, *The Role of Good Faith in Lender Liability Suits: Rising Star or Fading Gadfly* (1989) 31 Ariz. L.Rev. 939, 953 (hereafter Arizona Comment) [stating that *Seaman's* created an "undefined new source of liability" that will have the effect of "deter(ring) zealous advocacy"]; Comment, *Extending the Bad Faith Tort Doctrine to General Commercial Contracts* (1985) 65 B.U. L.Rev. 355, 376 [observing that *Seaman's* failed to articulate a "generally applicable tort

standard which would differentiate between mere breaches of contract and breaches of the tort duty of good faith and fair dealing"]; Comment, *Tort Remedies for Breach of Contract: The Expansion of Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Into the Commercial Realm* (1986) 86 Colum. L.Rev. 377, 401 (hereafter Columbia Comment) [finding "no principled distinction" between denial of a contract's existence, and denial that certain parts or terms exist, and concluding that *Seaman's* ultimate result "will be to expose commercial parties to tort-level damages whenever a party refuses to perform under the contract"]; Comment, *Bad Faith Lenders* (1989) 60 Colo. L.Rev. 417, 427 [*Seaman's* disclaimer of reliance on implied covenant is inconsistent with imposition of liability for bad faith denial of contract's existence]; Comment, *Lender Liability for Breach of the Obligation of Good Faith Performance* (1987) 36 Emory L.J. 917, 960 [*Seaman's* award of tort damages for contract breach is "troublesome" and "easy to misinterpret"]; Comment, *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.: Tortious Breach of the Covenant of Good Faith and Fair Dealing in a Noninsurance Commercial Contract Case* (1986) 71 Iowa L.Rev. 893, 898 ["*Seaman's* leaves attorneys to guess whether their commercial client's conduct is merely healthy capitalistic competition or manifest bad faith."]; Detortification Comment, *supra,* 26 Loyola L.A. L.Rev. at p. 239 ["[a] growing distaste for the *Seaman's* tort among the California appellate districts, in the Ninth Circuit and in other states mandates that the California Supreme Court . . . overrule *Seaman's*"]; Comment, *Sailing the Uncharted Seas of Bad Faith: Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1985) 69 Minn. L.Rev. 1161, 1175 (hereafter Minnesota Comment) [observing that *Seaman's* failure to distinguish its new tort from breaches of implied covenant of good faith "exacerbated the confusion" in the area].)

Many of the foregoing articles and commentaries observe that the *Seaman* decision, being unclear and subject to multiple interpretations, has resulted in widespread confusion among the lower courts. (E.g., Snyderman, *supra,* 55 U.Chi. L.Rev. at p. 1363 [*Seaman's* tort could be applied in all contract breach cases, resulting in "complete subversion of the expectation damages standard"]; Sebert, *supra,* 33 U.C.L.A. L.Rev. at pp. 1640-1641 [decision is "troubling" because it "singles out one particular type of breach for sanction—the bad faith denial of the existence of a contract"]; Detortification Comment, *supra,* 26 Loyola L.A. L.Rev. at p. 223, fn. omitted ["The *Seaman's* tort has generated confusion among California courts. Consequently, in recent decisions, almost every court offers a different interpretation of the tort. The one similarity . . . is that every court appears to limit the tort's application."].)

Additionally, several of these commentaries emphasize the extreme difficulty courts experience in distinguishing between tortious denial of a contract's existence and permissible denial of *liability* under the terms of the

contract. (Columbia Comment, *supra*, 86 Colum. L.Rev. at pp. 401-402; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 223-228.) Further confusion concerns the quantum of proof required to establish a denial of the existence of the contract (Detortification Comment, *supra*, 26 Loyola L.A. L.Rev.at pp. 227-228; see *DuBarry*, *supra*, 231 Cal.App.3d at pp. 572-575) and, as previously discussed, whether or not proof is required of a "special relationship" between the contracting parties (Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. at pp. 229-231, and cases cited).

The foregoing commentaries raise a wide variety of additional criticisms that support reconsideration of the *Seaman's* decision, including widespread confusion among judges and juries in applying its holding, inappropriately excessive damage awards, overcrowded court dockets and speculative litigation, delay and complication of ordinary contract breach claims, deterrence of contract formation, and restraint on zealous advocacy. (See, e.g., Arizona Comment, *supra*, 31 Ariz. L.Rev. at p. 953; Columbia Comment, *supra*, 86 Colum. L.Rev.at p. 402; Detortification Comment, *supra*, 26 Loyola L.A. L.Rev. pp. 236-238.) As one article observes, *Seaman's* created "intolerable uncertainty" and constitutes a "dangerous misstep" that this court should "promptly correct." (Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at p. 499.)

As we stated in *Moradi-Shalal*, *supra*, 46 Cal.3d at page 299, "the breadth of the criticism . . . is disturbing and, like the flood of contrary decisions of other state courts, is pertinent to our determination whether or not to reconsider that decision. [Citation.]"

## V. *Seaman's Should Be Overruled*

 As previously indicated, the *Seaman's* decision has generated uniform confusion and uncertainty regarding its scope and application, and widespread doubt about the necessity or desirability of its holding. These doubts and criticisms, express or implied, in decisions from this state and from other state and federal courts, echoed by the generally adverse scholarly comment cited above, convince us that *Seaman's* should be overruled in favor of a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of "an independent duty arising from principles of tort law" (*Applied Equipment*, *supra*, 7 Cal.4th at p. 515) other than the bad faith denial of the existence of, or liability under, the breached contract.

As set forth above, the critics stress, among other factors favoring *Seaman's* abrogation, the confusion and uncertainty accompanying the decision, the need for stability and predictability in commercial affairs, the potential for excessive tort damages, and the preference for legislative rather than judicial action in this area.

Even if we were unimpressed by the nearly unanimous criticism leveled at *Seaman's*, on reconsideration the analytical defects in the opinion have become apparent. It seems anomalous to characterize as "tortious" the bad faith denial of the existence of a contract, while treating as "contractual" the bad faith denial of liability or responsibility under an acknowledged contract. In both cases, the breaching party has acted in bad faith and, accordingly, has presumably committed acts offensive to "accepted notions of business ethics." (*Seaman's, supra*, 36 Cal.3d at p. 770.) Yet to include bad faith denials of liability within *Seaman's* scope could potentially convert every contract breach into a tort. Nor would limiting *Seaman's* tort to incidents involving "stonewalling" adequately narrow its potential scope. Such conduct by the breaching party, essentially telling the promisee, "See you in court," could incidentally accompany *every* breach of contract.

For all the foregoing reasons, we conclude that *Seaman's* should be overruled. We emphasize that nothing in this opinion should be read as affecting the existing precedent governing enforcement of the implied covenant in insurance cases. Further, nothing we say here would prevent the Legislature from creating additional civil remedies for noninsurance contract breach, including such measures as providing litigation costs and attorney fees in certain aggravated cases, or assessing increased compensatory damages covering lost profits and other losses attributable to the breach, as well as restoration of the *Seaman's* holding if the Legislature deems that course appropriate. (See, e.g., Ashley, Bad Faith Actions; Liability and Damages, *supra*, § 11.05, at p. 14 ["[t]he uniform liberalization of contract damages rules is what is needed"]; Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at pp. 481-499; Detortification Comment, *supra*, 26 Loyola L.Rev. at p. 238; Minnesota Comment, *supra*, 69 Minn. L.Rev. at p. 1198.) Thus far, however, the Legislature has not manifested an intent either to expand contract breach recovery or to provide tort damages for ordinary contract breach.

## VII. *Conclusion*

The judgment of the Court of Appeal, reversing the trial court's judgment in plaintiff's favor and remanding the case for a retrial limited to the issue of damages under plaintiff's breach of contract cause of action, and for judgment in favor of defendant on plaintiff's bad faith denial of contract cause of action, is affirmed.

Baxter, J., Werdegar, J., and Klein, J.,* concurred.

---

*Presiding Justice, Court of Appeal Second Appellate District, Division Three, assigned by the Acting Chairperson of the Judicial Council.

**KENNARD, J.,** Concurring.—I concur in the majority opinion except for its discussion of *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174 [26 Cal.Rptr.2d 8, 864 P.2d 88]. In my view, *Hunter* has no bearing on this case because the conduct complained of by plaintiff here, unlike the conduct at issue in *Hunter*, does not amount to the violation of any independent duty arising from principles of tort law. Accordingly, the majority's discussion of *Hunter* is unnecessary to its holding and adds nothing to the reasoning supporting that holding.

Arabian J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment. I disagree, however, with the majority's conclusion that *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158] (*Seaman's*) was wrongly decided. Although in retrospect I believe its holding was too broad, our task, both for the sake of sound public policy and stare decisis, is to clarify rather than repudiate that holding.

The majority would displace *Seaman's* with "a general rule precluding tort recovery for noninsurance contract breach,[1] at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (Maj. opn., *ante*, at p. 102.) I agree that the bad faith denial of the existence of a contract or contractual liability, *alone*, cannot give rise to tort liability. I agree as well with the tautological proposition that a breach of contract is made tortious only when some "independent duty arising from tort law" is violated.

In my view, however, this "independent duty arising from tort law" can originate from torts other than those traditionally recognized at common law. There are some types of intentionally tortious behavior unique to the contractual setting that do not fit into conventional tort categories. Allowing for the possibility of tort causes of action outside conventional categories is

---

[1]The majority's holding, precluding tort recovery for "noninsurance contract breach" should not be misinterpreted. We have found that the breach of the covenant of good faith and fair dealing by an insurer against an insured will sound in tort, due to the "special relationship" between the two parties. (See *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141].) In *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*), while this court declined to find a similar "special relationship" in the employment context, it also explicitly did not decide the question whether such a relationship could be found elsewhere. (*Id.* at pp. 687-688.) As the majority recognize, the present case does not concern parties involved in an allegedly special relationship; Freeman & Mills, Inc., admits that no such special relationship existed. Therefore, the majority's holding should not be taken as deciding a question not before this court, and left open by *Foley*, whether there are relationships between contracting parties outside the insurance field which may give rise to tort remedies for breach of the covenant of good faith and fair dealing.

consistent with the malleable and continuously evolving nature of tort law. " 'The law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.' " (*Soldano* v. *O'Daniels* (1983) 141 Cal.App.3d 443, 454-455 [190 Cal.Rptr. 310, 37 A.L.R.4th 1183], quoting Prosser on Torts (4th ed. 1971) pp. 3-4.)

*Seaman's* should be viewed within the context of this common law tradition of innovation. When *Seaman's* is understood in light of its facts, it stands for the proposition, in my view, that a contract action may also sound in tort when the breach of contract is intentional and in bad faith, *and* is aggravated by certain particularly egregious forms of intentionally injurious activity. Because, as will be explained, there is no such tortious activity in the present case, I concur in the majority's disposition.

I will discuss below the various circumstances under which courts have found or may find a breach of contract to be tortious—circumstances broader than may be suggested by the majority's holding. As I will explain, a tortious breach of contract outside the insurance context may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigatable harm in the form of mental anguish, personal hardship, or substantial consequential damages. I will then explain why in my view *Seaman's* was correctly decided. Finally, I will explain why *Seaman's* is distinguishable from the present case.

## I.

The notion that a breach of contract might be tortious causes conceptual difficulty because of the fundamental difference between the objectives of contract and tort law. " ' "[Whereas] [c]ontract actions are created to protect the interest in having promises performed," "[t]ort actions are created to protect the interest in freedom from various kinds of harm. The duties of conduct which give rise to them are imposed by law, and are based primarily on social policy, not necessarily based upon the will or intention of the parties . . . ." ' " (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment Corp.*), quoting *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 176 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].)

This difference in purpose has its greatest practical significance in the differing types of damages available under the two bodies of law. "Contract

damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." (*Applied Equipment Corp.*, *supra*, 7 Cal.4th at p. 515.) Damages for emotional distress and mental suffering, as well as punitive damages, are also generally not recoverable. (*Id.* at p. 516.) "This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Id.* at p. 515.) "In contrast, tort damages are awarded to compensate the victim for injury suffered. [Citation.] 'For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' (Civ. Code, § 3333.)" (*Applied Equipment Corp.*, *supra*, 7 Cal.4th at p. 516.) Both emotional distress damages and punitive damages are, under the proper circumstances, available to the tort victim.

Tort and contract law also differ in the moral significance that each places on intentional injury. Whereas an intentional tort is seen as reprehensible—the deliberate or reckless harming of another—the intentional breach of contract has come to be viewed as a morally neutral act, as exemplified in Justice Holmes's remark that "[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else." (Holmes, *The Path of the Law* (1897) 10 Harv. L.Rev. 457, 462.) This amoral view is supported by the economic insight that an intentional breach of contract may create a net benefit to society. The efficient breach of contract occurs when the gain to the breaching party exceeds the loss to the party suffering the breach, allowing the movement of resources to their more optimal use. (See Posner, Economic Analysis of Law (1986) pp. 107-108.) Contract law must be careful "not to exceed compensatory damages if it doesn't want to deter efficient breaches." (*Id.* at p. 108.)

But while the purposes behind contract and tort law are distinct, the boundary line between the two areas of the law is neither clear nor fixed. As Justice Holmes also observed, "the distinction between tort and breaches of contract, and especially between the remedies for the two, is not found ready made." (Holmes, The Common Law (1881) p. 13.) Courts have long permitted a party to a contract to seek tort remedies if behavior constituting a contract breach also violates some recognized tort duty. The courts "have extended the tort liability for misfeasance to virtually every type of contract where defective performance may injure the promisee. An attorney or an abstractor examining a title, a physician treating a patient, a surveyor, an agent collecting a note or lending money or settling a claim, or a liability

insurer defending a suit, all have been held liable in tort for their negligence. . . . The principle which seems to have emerged from the decisions in the United States is that there will be liability in tort for misperformance of a contract whenever there would be liability for gratuitous performance without the contract—which is to say, whenever such misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff." (Prosser & Keeton on Torts (5th ed. 1984) Tort and Contract, pp. 660-661, fns. omitted.) Stated another way, " '[c]onduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability.' " (*Groseth Intern., Inc.* v. *Tenneco, Inc.* (S.D. 1981) 440 N.W.2d 276, 279.)

Nor are the rules that determine whether the action will sound in tort or contract, or both, clear-cut. When the breach of contract also involves physical injury to the promisee, or the destruction of tangible property, as opposed to damage to purely economic interests, then the action will generally sound in tort. Thus, a manufacturer that sells defective automobiles may be liable to an automobile dealer in contract for delivery of nonconforming goods, but will be liable in tort if one of the nonconforming automobiles leads to an accident resulting in physical injury. But society also imposes tort duties to protect purely economic interests between contracting parties— such as the duty of care imposed on accountants for malpractice (see *Lindner* v. *Barlow, Davis & Wood* (1962) 210 Cal.App.2d 660, 665 [27 Cal.Rptr. 101]), or on banks for wrongfully dishonoring checks (see *Weaver* v. *Bank of America* (1953) 59 Cal.2d 428, 431 [30 Cal.Rptr. 4, 380 P.2d 644])—as well as the recognition of intentional torts such as promissory fraud. The complete failure to perform a contractual obligation generally sounds in contract, but once a contractual obligation has begun, a failure to perform which injures the promisee may sometimes sound in tort. (Prosser & Keeton on Torts, *supra*, pp. 661-662.) Perhaps the most reliable manner to differentiate between actions that are purely contract breaches and those that are also tort violations is the following abstract rule: courts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.

It is also true that public policy does not always favor a limitation on damages for *intentional* breaches of contract. The notion that society gains from an efficient breach must be qualified by the recognition that many intentional breaches are not efficient. (See Putz & Klippen, *Commercial Bad Faith: Attorney Fees—Not Tort Liability—Is the Remedy for "Stonewalling"* (1987) 21 U.S.F. L.Rev. 419, 482 (hereafter Putz & Klippen); Sebert,

*Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation* (1986) 33 U.C.L.A. L.Rev. 1565, 1573 (hereafter Sebert); *Patton* v. *Mid-Continent Systems, Inc.* (7th Cir. 1988) 841 F.2d 742, 751 (*Patton*).) As Judge Posner explained in *Patton, supra,* 841 F.2d at page 751: "Not all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon costs, and exploits the inadequacies of purely compensatory remedies (the major inadequacies being that pre-and post-judgment interest rates are frequently below market levels when the risk of nonpayment is taken into account and that the winning party cannot recover . . . attorney's fees." Commentators have also pointed to other "inadequacies of purely compensatory remedies" that encourage inefficient breaches (i.e. breaches that result in greater losses to the promisee than gains for the promisor): the lack of emotional distress damages, even when such damages are the probable result of the breach, and the restriction of consequential damages to those in the contemplation of the parties at the time the contract was formed. (See Diamond, *The Tort of Bad Faith Breach of Contract: When, If at All, Should It Be Extended Beyond Insurance Transactions?* (1981) 64 Marq. L.Rev. 425; 439-443; see also Sebert, *supra,* 33 U.C.L.A. L.Rev. at p. 1578.)

In addition to fully compensating contract plaintiffs and discouraging inefficient breaches, the imposition of tort remedies for certain intentional breaches of contract serves to punish and deter business practices that constitute distinct social wrongs independent of the breach. For example, we permit the plaintiff to recover exemplary damages in cases in which the breached contract was induced through promissory fraud, even though the plaintiff has incurred the same loss whether the contract was fraudulently induced or not. (See *Walker* v. *Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 995-998 [149 Cal.Rptr. 119].) Our determination to allow the plaintiff to sue for fraud and to potentially recover exemplary damages is not justified by the plaintiff's greater loss, but by the fact that the breach of a fraudulently induced contract is a significantly greater wrong, from society's standpoint, than an ordinary breach. "We are aware of the danger of grafting tort liability on what ordinarily should be a breach of contract action. . . . However, no public policy is served by permitting a party who never intended to fulfill his obligations to fraudulently induce another to enter into an agreement." (*Las Palmas Associates* v. *Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1238 [1 Cal.Rptr.2d 301].)

As the above illustrate, the rationale for limiting actions for intentional breaches of contract to contract remedies—that such limitation promotes commercial stability and predictability and hence advances commerce—is

not invariably a compelling one. Breaches accompanied by deception or infliction of intentional harm may be so disruptive of commerce and so reprehensible in themselves that the value of deterring such actions through the tort system outweighs the marginal loss in the predictability of damages that may result. But in imposing tort duties to deter intentionally harmful acts among contracting parties, courts must be cautious not to fashion remedies which overdeter the illegitimate and as a result chill legitimate activities. (See Posner, Economic Analysis of Law, *supra*, at p. 108.) Thus, courts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be, as in the case of fraud, to aid rather than discourage commerce.

As observed above, not all tortious breaches of contract arise from conventional torts. Numerous courts have recognized types of intentionally tortious activity that occur exclusively or distinctively within the context of a contractual relationship. The most familiar type of tortious breach of contract in this state is that of the insurer, whose unreasonable failure to settle or resolve a claim has been held to violate the covenant of good faith and fair dealing. (*Egan* v. *Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d 809.) Tort liability is imposed primarily because of the distinctive characteristics of the insurance contract: the fiduciary nature of the relationship, the fact that the insurer offers a type of quasi-public service that provides financial security and peace of mind, and the fact that the insurance contract is generally one of adhesion. (*Id.* at pp. 820-821.) In these cases, the special relationship between insurer and insured supports the elevation of the covenant of good faith and fair dealing, a covenant implied by law in every contract and generally used as an aid to contract interpretation (*Foley*, *supra*, 47 Cal.3d at p. 684), into a tort duty.

Because the good faith covenant is so broad and all-pervasive, this court and others have been reluctant to expand recognition of the action for tortious breach of the covenant beyond the insurance context. (See *Foley*, *supra*, 47 Cal.3d at p. 692 [no special relationship in the employment context]; but see *id.* at pp. 701, 715, 723 (separate conc. and dis. opns. of Broussard, J., Kaufman, J., and Mosk, J.).) Unfortunately, the preoccupation of California courts with limiting the potentially enormous scope of this tort has diverted attention away from the useful task of identifying *specific practices* employed by contracting parties that merit the imposition of tort remedies. Other jurisdictions not so preoccupied have made greater progress in developing a common law of tortious breach of contract. While the cases are not easily amenable to classification, they appear to fit into two broad categories.

The first category focuses on tortious *means* used by one contracting party to coerce or deceive another party into foregoing its contractual rights. For example, in *Advanced Medical* v. *Arden Medical Systems* (3d Cir. 1992) 955 F.2d 188, Advanced Medical, Inc. (Advanced), a distributor of medical products, entered into an agreement with a manufacturer of a high-technology blood analysis device, whereby the former was designated as the latter's exclusive distributor for the mid-Atlantic region. The manufacturing company was eventually acquired by Johnson & Johnson, which disapproved of the exclusive distributorship. Instead of merely breaching the agreement, Johnson & Johnson used a variety of questionable tactics to "drive Advanced out of the contract," including marketing competing products not made available to Advanced, and withholding its support services. (*Id.* at pp. 190-191.) The court, applying Pennsylvania law, held that in addition to a breach of contract, there was sufficient evidence to submit the question of punitive damages to a jury on a theory of Johnson & Johnson's "tortious interference" with its own contract. (*Id.* at pp. 201-202.) (See also *Adam's* v. *Crater Well Drilling, Inc.* (1976) 276 Ore. 789 [556 P.2d 679, 681] [punitive damages justified when contracting party uses threat of prosecution to obtain more than is owed under the contract]; *John A. Henry & Co., Ltd.* v. *T.G. & Y Stores Co.* (10th Cir. 1991) 941 F.2d 1068, 1072-1073 [punitive damages allowed under Oklahoma law when commercial tenant attempts to compel landlord to release it from its lease by fabricating defects in the landlord's maintenance and sending letters complaining of such defects to the landlord's lender, thereby disparaging the former's reputation]; *Jones* v. *Abriani* (1976)169 Ind.App. 556 [350 N.E.2d 635, 649] [punitive damages upheld when defendant mobile home salesman threatened to forfeit plaintiffs' down payment if plaintiffs did not accept delivery of a home with numerous defects and then reneged on promise to repair these defects].) One commentator provides another example of this kind of tortious breach derived from a case that was originally a companion to *Seaman's*: a major motion picture studio threatens to blacklist an actor appearing in one of its productions if he does not forfeit his contractual right to a prominent billing. (Ashley, Bad Faith Actions: Liability and Damages (1994) § 11.04, p. 6.)

The use of tortious means to breach a contract can also entail the use of deception by one of the contracting parties for the purpose of causing the other party to forego its contractual rights. In *Motley, Green & Co.* v. *Detroit Steel & Spring Co.* (C.C.S.D.N.Y. 1908) 161 Fed. 389, for example, the plaintiff was an exclusive sales agent within a given territory for the defendant, an automobile parts company. The defendant allegedly made a sham sale to another company for the sole purpose of extricating itself from the contract with the plaintiff. The court concluded that it was tortious for the defendant, in addition to breaching the contract, "to invite a third party to

unite with him and aid him in breaking the contract in such a way as possibly to escape liability in an action for nonperformance." (*Id.* at p. 397.) The court compared the case to one cited in a tort treatise of a plaintiff who was an " 'actor, . . . engaged to perform in the character of Hamlet, . . . and that the defendants and others maliciously conspired together to prevent the plaintiff from so performing, and from exercising his profession in the theater, and in pursuance of the conspiracy hired and procured divers persons to go to the theater and hoot the plaintiff, and the persons so hired, did. . . .' " (*Ibid.*;[2] see also *Houston Cable TV* v. *Inwood W. Civic Ass'n* (Tex.App. 1992) 839 S.W.2d 497, 504 [punitive damages upheld when cable company terminates contract to pay homeowners associations a percentage of revenue in exchange for rights of way to the association members' property by falsely informing the associations that a new federal law forbids them from making such payments].)

A second type of tortious intentional breach has been found when the *consequences* of the breach are especially injurious to the party suffering the breach, and the breaching party intentionally or knowingly inflicts such injury. Cases of this type have generally occurred outside the commercial context, involving manifestly unequal contracting parties and contracts concerning matters of vital personal significance, in which great mental anguish or personal hardship are the probable result of the breach. In these cases, courts have permitted substantial awards of emotional distress damages and/or punitive damages, both as a means of providing extra sanctions for a defendant engaging in intentionally injurious activities against vulnerable parties, and as a way of fully compensating plaintiffs for types of injury that are neither readily amendable to mitigation nor generally recoverable as contract damages. For example, in *K Mart Corp.* v. *Ponsock* (1987) 103 Nev. 39 [732 P.2d 1364, 1370], disapproved on other grounds by *Ingersoll-Rand Co.* v. *McClendon* (1990) 498 U.S. 133, 137 [112 L.Ed.2d 474, 482-483, 111

---

[2]I recognize that this court has recently held that a party cannot be liable in tort for interfering with its own contract. (*Applied Equipment Corp.*, *supra*, 7 Cal.4th 503 [but see p. 521, dis. opn. of Mosk, J.].) Even if it is conceded, however, that *Applied Equipment Corp.* is generally correct that a party who "interferes" with its own contract does no more than breach the contract, and should not be held liable in tort, the rule appears to me not to apply to the exceptional case when the promisor not only acts in concert with a third party, but does so in an attempt to deceive the promisee as to the promisor's liability. In these cases, the material wrongdoing is not the conspiracy per se, but the deceitful conduct and the fraudulent design. Although it may be argued that "the mere entry of a stranger onto the scene does not render the contracting party's breach more socially or morally reprehensible" (*id.* at p. 517), the use of the third party for a scheme of deception to conceal the promisor's liability does in fact introduce an additional element of moral culpability. Moreover, in economic terms, if the efficiency promoted by contract law turns on the promisee being able to receive contract damages for a breach, then one who engages in such a conspiracy undermines this efficiency by not only denying liability, but actively conspiring to conceal it.

S.Ct. 478], the Nevada Supreme Court allowed a $50,000 award of punitive damages to stand when an employer discharged a long-term employee on a fabricated charge for the purpose of defeating the latter's contractual entitlement to retirement benefits. (See also *Ainsworth* v. *Franklin Cty. Cheese Corp.* (1991) 156 Vt. 325 [592 A.2d 871, 871, 874-875] [punitive damages permitted when a defendant/employer discharged on pretext of good cause the plaintiff/employee in order to extricate itself from the obligation to pay severance benefits].)

In other cases of this type, an intentional breach of a warranty of habitability by a landlord or building contractor has given rise to substantial emotional distress or punitive damages awards. For example, Missouri courts recognize that a wrongful eviction will sound in tort as well as contract. (*Ladeas* v. *Carter* (Mo.App.1992) 845 S.W.2d 45, 52; see also *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313, 318-319 [198 P.2d 696] [wrongful eviction accompanied by verbal abuse sounds in tort]; *Hilder* v. *St. Peter* (1984) 144 Vt. 150 [478 A.2d 202, 210] [punitive damages permitted against a landlord who, "after receiving notice of a defect, fails to repair the facility that is essential to the health and safety of his or her tenant"]; *B & M Homes, Inc.* v. *Hogan* (Ala. 1979) 376 So.2d 667, 671-672 [7 A.L.R.4th 1162] [substantial emotional distress damages award against contractor who refused to repair construction defects leading to great personal discomfort]; *Ducote* v. *Arnold* (La.Ct.App. 1982) 416 So.2d 180, 183-185 [damages for mental anguish permitted for breach of home remodeling contract].) The New Mexico Supreme Court, in *Romero* v. *Mervyn's* (1989) 109 N.M. 249 [784 P.2d 992, 999-1001], citing *Seaman's* with approval, upheld a punitive damage award against a department store, which had entered into an oral agreement to pay the medical expenses of a customer accidentally injured on its premises, and then reneged on its agreement.

The principle that certain contractual interests of vulnerable parties deserve greater protection than ordinary contract damages would otherwise provide has led our Legislature to authorize special sanctions for various types of intentional breaches. For example, one who is the victim of an intentional breach of warranty of consumer goods may recover twice the amount of actual damages (Civ. Code, § 1794, subd. (c)) and treble damages may be awarded to a retail seller who is injured by "willful or repeated" warranty violations (*id.*, § 1794.1, subd. (a)). Labor Code section 206 provides for treble damages for the willful failure to pay wages after the Labor Commissioner determines the wages are owing. But the fact that the Legislature has acted in some instances to afford these special protections does not mean that it has preempted the courts from exercising their traditional role of fashioning appropriate tort remedies for various kinds of intentionally injurious conduct.

In sum, the above cited cases show that an intentional breach of contract may be found to be tortious when the breaching party exhibits an extreme disregard for the contractual rights of the other party, either knowingly harming the vital interests of a promisee so as to create substantial mental distress or personal hardship, or else employing coercion or dishonesty to cause the promisee to forego its contractual rights. These cases illustrate the recognition by a number of jurisdictions that an intentional breach of contract outside the insurance context, and not accompanied by any conventional tortious behavior such as promissory fraud, may nonetheless be deemed tortious when accompanied by these kinds of aggravating circumstances.

With this in mind, I next reconsider the *Seaman's* case.

## II.

In *Seaman's, supra,* 36 Cal.3d 752, Seaman's Direct Buying Service, Inc. (Seaman's), a dealer in ship supplies in the City of Eureka, sought to establish a marine fuel dealership in the new marina that the city was planning to build with federal funds. Seaman's negotiated with the Mobil Oil Company and Standard Oil Company of California (Standard) for a supply contract that would enable it to establish the dealership. The city required such a contractual commitment before it would allow Seaman's to lease a significant part of the new marina. Seaman's signed a tentative 10-year Chevron Marine dealer agreement with Standard. As part of the agreement, Standard consented to provide Seaman's with a fuel discount as well as a loan to construct the new fueling facility, amortized over the life of the agreement. Shortly thereafter, Seaman's entered into the lease it had sought from the city. (*Id.* at pp. 759-760.)

Soon after, the 1973 oil embargo changed conditions, and a federal program mandating allocations among existing petroleum customers went into effect. Standard claimed it could not supply fuel to Seaman's because of the federal program, and claimed it was willing to help Seaman's obtain the necessary variance from federal regulation. Seaman's successfully obtained a supply order from the federal government, but Standard appealed, thereupon revealing that it was in fact antagonistic to Seaman's interests. Standard's federal appeal was successful, but was later reversed, and the court directed Standard to fulfill supply obligations to Seaman's "upon the filing of a copy of a court decree that a valid contract existed between the parties under state law." Seaman's asked Standard to stipulate to the existence of a contract, but Standard's reply was, "See you in court." Seaman's testified that if Standard had cooperated, Seaman's could have borrowed funds to

remain in business until 1976 when the new marina opened. Instead, Seaman's discontinued operations in early 1975. Seaman's sued and received a large compensatory and punitive damages award. (*Seaman's*, *supra*, 36 Cal.3d at pp. 760-762.)

In considering the validity of the punitive damages award against Standard for breach of the covenant of good faith and fair dealing, we acknowledged that the case differed from the insurance cases, in which a special relationship between the insurer and the insured existed, and in which the breach of the good faith covenant may give rise to a tort action. We stated: "When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. . . . In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties." (*Seaman's*, *supra*, 36 Cal.3d at p. 769.)

We then stated that we did not need to decide the claim raised by Seaman's that the breach of the good faith covenant in ordinary commercial contracts gave rise to tort liability. Instead, "[i]t is sufficient to recognize that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (*Seaman's*, *supra*, 36 Cal.3d at p. 769.) We cited the holding of *Adams v. Crater Well Drilling, Inc.*, *supra*, 556 P.2d 679, 681, that one who coerces another party to pay more than is due under the terms of the contract through the threat of a lawsuit made " ' "without probable cause and with no belief in the existence of the cause of action." ' " (36 Cal.3d at p. 769.) We concluded that "[t]here is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics." (*Seaman's*, *supra*, 36 Cal.3d at pp. 769-770.)

*Seaman's* was correct, in my view, in refusing to rely on the general breach of the covenant of good faith and fair dealing as a justification for imposing tort remedies, and instead seeking to identify specific practices used by Standard that violated "accepted notions of business ethics." *Seaman's* wisely recognized that courts do not have to choose between the

wholesale transformation of a breach of the implied good faith covenant into a tort and the complete refusal to recognize a cause of action for tortious breach of contract. In retrospect, however, *Seaman's* holding appears to be both overly broad and overly narrow. It was overly narrow because, as numerous authorities cited by the majority point out, there is no logical reason to distinguish between the tort of "bad faith denial of the existence of a contract" and "bad faith denial of liability under a contract." The former is but a subspecies of the latter. Both forms of bad faith are equally reprehensible on the defendant's part and equally injurious to plaintiff.

*Seaman's* was overly broad because, for a number of reasons, it appears to have been unwise to impose tort liability for *all* breaches that involve bad faith denial of a contract or liability under the contract. Although the bad faith denial of contractual liability may be ethically inexcusable, we should hesitate to categorically impose tort liability on such activity for fear it may overly deter legitimate activities that we wish to permit or encourage. Specifically, the bad faith denial of the existence of a contract consists of two actions on the defendant's part that do not, taken individually, give rise to tort liability: First, the defendant intentionally breaches its contract. As discussed above, because of our notions of efficient breach and the freedom of the marketplace, we have generally not considered an intentional breach tortious.

Second, the defendant asserts a bad faith defense to liability under the contract—or, more precisely, *threatens* to assert such a defense We have consistently refused to recognize a tort of "malicious defense" that would be equivalent to that of malicious prosecution. The refusal to recognize such a tort "protect[s] the right of a defendant, involuntarily haled into court, to conduct a vigorous defense." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 52 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) Instead, the Legislature has fashioned a more limited punishment to fit the "crime" of bad faith defense to a civil action: the awarding of attorney fees and other reasonable expenses incurred by a party to litigation as the result of another's bad faith actions "that are frivolous or solely intended to cause unnecessary delay." (Code Civ. Proc., § 128.5, subd. (a).) So too, the proper remedy to deter intentional breaches that are combined with bad faith denials of liability is to consistently award attorney fees to the plaintiffs as a sanction. (See Putz & Klippen, *supra*, 21 U.S.F. L.Rev. at pp. 493-495). But if a bad faith defense is not a tortious act, then the threat of such defense, as occurred in *Seaman's*, also cannot be considered tortious.

*Seaman's* was nonetheless correctly decided, in my view, on narrower grounds than bad faith denial of the contract's existence. As discussed

above, a number of cases allow tort damages for an intentional breach which the breaching party knows will probably result in significant emotional distress or personal hardship. In the commercial sphere, we do not as a rule permit such recovery for personal distress—the frustrations that attend breached contracts, unreliable suppliers, and the like are part of the realities of commerce. Society expects the business enterprise to go to the market-place to seek substitutes to mitigate its losses, and to seek contract damages for those losses that cannot be mitigated. But there are some commercial cases in which the harm intentionally inflicted on an enterprise cannot be mitigated, and in which ordinary contract damages are insufficient compensation. *Seaman's* is such a case. In *Seaman's*, because of the unusual combination of market forces and government regulation set in motion by the 1973 oil embargo, Standard's conduct had a significance beyond the ordinary breach: its practical effect was to shut *Seaman's* out of the oil market entirely, forcing it out of business. In other words, Standard intentionally breached its contract with Seaman's with the knowledge that the breach would result in Seaman's demise. Having thus breached its contract with blithe disregard for the severe and, under these rare circumstances, unmitigatable injury it caused Seaman's, Standard was justly subject to tort damages.

In sum, I would permit an action for tortious breach of contract in a commercial setting when a party intentionally breaches a contractual obligation with neither probable cause nor belief that the obligation does *not* exist, *and* when the party intends or knows that the breach will result in severe consequential damages to the other party that are not readily subject to mitigation, and such harm in fact occurs. This rule is a variant of the more general rule of tort law that, as Holmes said, "the intentional infliction of temporal damage[3] is a cause of action, which, as a matter of substantive law, . . . requires a justification if the defendant is to escape." (*Aikens* v. *Wisconsin* (1904) 195 U.S. 194, 204 [49 L.Ed. 154, 159, 25 S.Ct. 3].) A breach should not be considered tortious if the court determines that it was justified by avoidance of some substantial, unforeseen cost on the part of the breaching party, even if such cost does not excuse that party's nonperformance. (See 3A Corbin on Contracts (1994 Supp.) § 654E, p. 109.) Nor should a tortious breach under these circumstances be recognized if it is clear that the party suffering the harm voluntarily accepted that risk under the contract. But the intentional or knowing infliction of severe consequential damages on a business enterprise through the unjustified, bad faith

---

[3]Standard's breach "intentionally" inflicted harm on Seaman's in the sense in which the term "intentional" is commonly used in tort law, i.e., extending "not only to having in the mind a purpose (or desire) to bring about given consequences *but also having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act.*" (Prosser & Keeton on Torts, *supra*, Intentional Interference With the Person, p. 34, fn. omitted, italics added.)

breach of a contract is reprehensible and costly both for the party suffering the breach and for society as a whole, and is therefore appropriately sanctioned through the tort system.

## III.

The present case, on the other hand, is essentially a billing dispute between two commercial entities. Belcher Oil Company claimed, apparently in bad faith and without probable cause, that it had no contractual agreement with Freeman & Mills. That is, Belcher Oil not only intentionally breached its contract, but then asserted a bad faith defense to its liability. As explained above, the solution which the Legislature has devised for this kind of transgression is the awarding of the other party's attorney fees, and this is precisely what occurred—Freeman & Mills was awarded $212,891 in attorney fees pursuant to Code of Civil Procedure sections 128.5 and 2033, subdivision (c). To permit the award of punitive damages in addition to this sum would upset the legislative balance established in the litigation sanctions statutes and make tortious actions—intentional breach of contract and the assertion of a bad faith defense—which we have consistently held not to be tortious.

On this basis, I concur in the majority's disposition in favor of Belcher Oil on the bad faith denial of contract cause of action.