**HOUSTON CABLE TV, INC., Warner Cable Communications, Inc., Warner Cable Communications of Harris County, Inc. and Warner Communications, Inc., Appellants,**

v.

**INWOOD WEST CIVIC ASSOCIATION, INC., et al., Appellees.**

**No. A14–90–00949–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 8, 1992.

Rehearing Denied Oct. 29, 1992.

Ronald G. Wiesenthal, Roger D. Townsend, Ben Taylor, Jennifer Hogan, Houston, for appellants.

Kevin H. George, David W. Holman, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and SEARS and ELLIS, JJ.

## OPINION

SEARS, Justice.

Seventeen homeowners' associations sued appellants for breach of contract, fraud, tortious interference, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, estoppel and ratification. At the close of the evidence, the trial court found the appellants were alter egos of each other as a matter of law. Following the jury's verdict on the remaining issues, the trial court entered judgment for appellees. Appellants have raised nine points complaining of error in the trial court because a trial amendment was granted, alter ego was found as a matter of law, there were not findings by the jury as to each appellant, the evidence was legally and factually insufficient, punitive damages were awarded, and prejudgment and post-judgment interest were incorrectly awarded. We affirm.

In 1979, to avoid the expense and cumbersome process of negotiating individual rights-of-way with each of the homeowners in suburban Houston subdivisions, appellants (or entities they purchased) entered into contracts with homeowners' associations. The associations executed "right-of-way" agreements with appellants and did the work of convincing recalcitrant homeowners to permit the cable lines to be laid on their easements. In exchange, appellants agreed to pay the homeowners' associations two or three percent of gross revenues. These agreements were very valuable to appellants. Once their cable lines were run through the subdivisions, no other cable companies were willing to place lines in those areas and appellants became the exclusive cable television providers to the area.

In 1986, when appellants had achieved nearly complete penetration of the market, they decided they no longer wanted to pay the agreed percentage to the associations because the expense "was in excess of $300,000 a year." They sent letters to approximately 150 homeowners' associations, including appellees, falsely telling them that appellants were prohibited by new federal legislation from continuing payments under the contracts in order "to avoid a confrontation with the homeowner associations." Many of these associations accepted appellants' explanation and did nothing. However, appellees complained to their congressmen and learned that the new legislation did not prevent appellants' performance of the contracts. Appellees subsequently brought this suit after discovering they had tort and breach of contract claims arising from the actions of appellants.

In point of error two, appellants complain the trial court erred in granting appellees' trial amendment. At the close of the evidence, and after both parties had rested, appellees moved for a trial amendment to supplement their Fifth Amended Original Petition. The trial amendment alleged that each of the defendants (appellees) were "managed and operated as the alter ego of the other with respect to the 'Houston operation' of 'Warner Cable'[; e]ach is the alter ego for the other with respect to the contracts which are the subject of this suit."

 Rules 63, 66, and 67 of the Rules of Civil Procedure have been interpreted to require a trial court to liberally permit trial amendments. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939–41 (Tex.1990). *See* TEX.R.CIV.P. 63, 66, 67. The burden of showing prejudice or sur-

prise rests on the party resisting the amendment. *Greenhalgh,* 787 S.W.2d at 939. Although appellants alleged surprise and prejudice, they presented no evidence to establish either surprise or prejudice. Such allegations, without more, are not sufficient to defeat a request for a trial amendment. *Wingate v. Hajdik,* 795 S.W.2d 717, 720 (Tex.1990).

■ The granting of a trial amendment is purely discretionary with the trial court and will not be disturbed on appeal absent a clear showing of an abuse of that discretion. *Ohio Medical Prods., Inc. v. Suber,* 758 S.W.2d 870, 872 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Since we find no abuse of discretion, point of error two is overruled.

■ In point of error one, appellants complain the trial court erred in finding as a matter of law that they were alter egos of each other and that a judgment against one would be a judgment against all. Appellants contend that alter ego is an independent ground of recovery and was waived by appellees when no jury question was tendered regarding alter ego. Further, appellants contend that the alter ego finding is improper since appellees have not conclusively established appellants' alter ego status.

Appellants' contention that the issue of alter ego was waived by appellees is without merit. The trial court found appellants' alter ego status as a matter of law pursuant to appellees' request. Therefore, a jury question on this issue was not required. Waiver cannot occur based on the lack of an unnecessary jury question.

As to appellants' contention that alter ego is not conclusively established, we will review the record, viewing the evidence in the light most favorable to appellants and disregarding all evidence and inferences to the contrary. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). If we find any evidence of probative value that raises a material fact issue, then the judgment must be reversed and the case remanded for the jury's determination of the issue. *Qantel Business*

*Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303–04 (Tex.1988).

■ Disregarding the corporate fiction is an equitable doctrine, and Texas takes a flexible fact-specific approach. *Castleberry v. Branscum,* 721 S.W.2d 270, 273 (Tex.1986) (citing *Gentry v. Credit Plan Corp.,* 528 S.W.2d 571, 575 (Tex.1975)). There are several different bases for disregarding the corporate fiction including where a corporation is operated "as a mere tool or business conduit of another corporation." *Id.* at 272. The Texas Supreme Court has held that because "the different bases for disregarding the corporate fiction involve questions of fact, ... [e]xcept in very special circumstances," the issue should be determined by the jury. *Id.* at 277 (citing TEX.CONST. art. I, § 15; and *State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 293 (Tex.1975)). However, where all the material facts are undisputed, the application of the alter ego doctrine is a question of law. *Tigrett v. Pointer,* 580 S.W.2d 375, 379 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.).

Under the facts of this case, we find that alter ego was conclusively established primarily by appellants' own evidence. Appellants' "management and operations are assimilated to the extent that the subsidiary is simply a name or conduit through which the parent conducts its business [and] the corporate fiction may be disregarded to prevent fraud or injustice." *Gentry v. Credit Plan Corp.,* 528 S.W.2d 571, 573 (Tex.1975). In a case such as this where appellants not only breached these contracts but also committed a tort in the process, appellees do "not have the burden of justifying a recovery against" the various corporations involved. *Id.* "The problem in such a case is essentially one of allocating the loss." *Id.* "[E]ach constituent corporation may be held liable for the debts incurred by the other component entities" since appellants operated as a "single business enterprise" to achieve a common business purpose. *Hideca Petroleum Corp. v. Tampimex Oil Int'l, Ltd.,* 740 S.W.2d 838, 844 (Tex.App.—Houston [1st Dist.] 1987, no writ) (citing *Paramount*

*Petroleum Corp. v. Taylor Rental Ctr.,* 712 S.W.2d 534 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.)). Thus, special circumstances exist to support the trial court's action in finding alter ego as a matter of law.

The evidence establishes that Houston Cable TV, Inc., is a wholly owned subsidiary of Warner Cable Communications, Inc., which is a wholly owned subsidiary of Warner Communications, Inc. There is evidence that Houston Cable TV, Inc. represented to certain homeowners' associations that it was associated with Warner Communications. Letters were sent out to homeowners' associations showing the company name as Houston Cable TV, Inc./Warner–Amex. There was testimony that Warner–Amex Cable Communications is now Warner Cable Communications, Inc. Further, the Director of Public and Government Affairs and Commercial Services for Warner Cable Communications, Inc., James M. Leach (Leach), testified that Warner Cable involved itself in the day-to-day operations of Houston Cable TV, Inc. However, he stated that to his knowledge, Warner Communications did not have daily involvement with Houston Cable. In his testimony, he referred to "we, the company, Warner–Amex, Houston Cable TV" as if it were all one company. He answered questions in the context of "Warner Cable" as *one* company. Leach testified in his deposition he went to work for Warner–Amex Cable in 1981, but then at trial he testified he went to work for Houston Cable TV in 1981. On another occasion he testified he worked for QUBE.

There was also evidence from Leach's testimony, and appellants' answers to interrogatories that Columbia Communications, Inc., Texas Cablevision, Inc., Spring Video, Inc., and all of their contracts, were acquired by a Warner Cable entity. Leach was unsure which Warner entity originally acquired these companies and contracts because "there's an awful lot of companies involved here and I'm unclear as to them," but they were all ultimately held by Warner Cable Communications, Inc. In other answers to interrogatories, appellants stated that Warner Communications, Inc. (not Warner Cable Communications) acquired Houston Cable TV, Inc., Columbia Communications, Texas Cablevision, and Spring Video by purchase. Additionally, Leach testified to the truth of the contents of a newspaper article admitted into evidence which stated that Warner Communications, Inc. was formerly Houston Cable TV. As he stated, there was "apparently" some confusion. The acquisition of Houston Cable TV, Inc., Columbia Communications, Texas Cablevision, Gulf Coast Cable and Spring Video by Warner Communications, Inc. was judicially admitted by James Daley (Daley). Daley was President and General Manager of "Warner Cable," which from Daley's testimony is also known as Houston Cable TV, Inc.

According to Daley "[w]e operate under Warner Cable. It's not a legal entity." Daley further testified that he did "not operate the day-to-day business under legal entities. [He] operate[s] under an umbrella that's called Warner Cable which incorporates a number of legal entities." He stated he was "an officer of a number of different organizations of the different corporations but [he was] not sure exactly which ones at this point in time." Daley stated he reported to Ted Cutler (Cutler) a senior vice-president at Warner Cable but was "not sure of what company [Cutler] works for." The contracts with the various homeowners' associations were held according to Daley's testimony by "the Warner Cable operation that is operated in Houston." He also explained that "[o]perationally it's the Warner Cable operation that" laid the cable in the homeowners' subdivisions. Warner Cable "is the umbrella of the operation, whatever legal entity it is." His testimony indicated that there is more than one entity operating the cable services rendered to the subdivisions but it is all "Warner Cable." Daley stated that no matter what legal entity of "Warner Cable" was involved he was the person in charge of day-to-day operations who got subscriptions, and collected revenues. In discussing the proposed five-year plan for "Warner Cable Houston," Daley indicated he did not know what different Warner

entities the plan was given to because "[he] really [had] no understanding of who works for what legal entity within our company."

Although appellants' attorney attempted to object to generic references to "Warner Cable," their witnesses made it plain they could not differentiate between the different legal entities involved because they were all operated as "Warner Cable," the "company." In fact, in their own opening statement to the jury, appellants' attorneys stated they would prove that "Warner Cable has done nothing wrong," and they asked the jury to "discharge Warner Cable" from this lawsuit. They did not even discuss the other defendant entities because in reality they were all one. Appellants' officers and employees did not know for which legal entity they, or their supervisors, worked; they just worked for "Warner Cable." They took care of the daily operations of the "cable system" unaware of, and indifferent to, which legal entity was involved. Daley, the president and general manager of Warner Cable testified that he operated under an "umbrella" called Warner Cable, and that it included a number of legal entities. The evidence conclusively establishes that Warner Cable was the alter ego of the other entities, and vice-a-versa, and they all operated as one big happy family in dealing with its customers. Appellees' evidence established the homeowners' associations thought they were dealing with one Warner Cable entity and appellants' evidence proved they were right. Point of error one is overruled.

■ In points of error four and six, appellants contend the lack of jury findings against each individual appellant is error. Appellants complain there are no findings that any particular appellant breached any particular contract or committed a tort to support the judgment entered by the trial court. They also argue that separate findings by the jury of punitive damages against each individual appellant were required. Because of our disposition of point of error two, this point of error is without merit. The trial court found as a matter of law appellants were alter egos of each other and a judgment against one would be a judgment against all. Thus, a finding that Warner Cable, a "single business enterprise," breached its contracts with appellees, or committed a tort punishable by punitive damages, made findings against each individual appellant unnecessary. *Allright Texas, Inc. v. Simons*, 501 S.W.2d 145, 150 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.). *See also Transfer Prods., Inc. v. Texpar Energy, Inc.*, 788 S.W.2d 713, 717 (Tex.App.—Corpus Christi 1990, no writ); *Norton Refrigerated Express, Inc. v. Ritter Bros. Co.*, 552 S.W.2d 910, 913 (Tex.Civ.App.—Texarkana 1977, writ ref'd n.r.e.). Points of error four and six are overruled.

■ In point of error seven, appellants contend the evidence is legally and factually insufficient to support the jury's findings that they all breached contracts with all appellees, they all ratified contracts with all appellees, and they are all estopped from denying the existence of contracts with all appellees. Our disposition of point of error two means that if the evidence is legally and factually sufficient to support these finding as to "Warner Cable," it is sufficient to support them as to all appellants.

■ When reviewing a complaint of legally insufficient evidence or "no" evidence, we must consider only the evidence and inferences tending to support the jury's findings and disregard all evidence and inferences to the contrary. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990). After such a review of the favorable evidence, if we find any evidence of probative force to support the jury's findings, then they must be upheld. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex. 1989). In considering appellants' complaint of factually insufficient evidence, we must review all of the evidence and determine if the weight of the record supports the jury's findings. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

In summary, the record reflects that appellants or their predecessors in interest had contracts with appellees. A purchase contract signed by appellants was admitted into evidence showing contracts with several homeowners' associations as assets of Columbia Communications Company. Additionally, evidence of the existence and terms of other lost or misplaced contracts, as reflected by payments made, was introduced. The fact that a written instrument is lost does not negate the rights and obligations of the parties to the contract because the writing is merely evidence of the rights and obligations. *Chandler v. Brown,* 301 S.W.2d 720, 722 (Tex. Civ.App.—El Paso 1957, writ ref'd n.r.e.), *cert. denied,* 356 U.S. 930, 78 S.Ct. 773, 2 L.Ed.2d 761 (1958). Thus, the evidence established that when appellants acquired each of the cable companies which had contracted with the various subdivisions all of their assets and contracts were acquired also. Appellants paid on these contracts for several years, as evidenced by checks executed by Columbia Communications payable to various homeowners' associations, followed by subsequent checks executed by Warner Cable or Warner Cable Communications, and other checks payable to certain homeowners' associations executed by Warner–Amex which later became Warner Cable Communications. The evidence is clear appellants decided that they no longer wanted to pay the percentage due under the contracts for the sole reason that they felt the expense was too great. Appellants sent out letters to the homeowners' associations telling them they were not going to make payments under the contracts anymore and falsely based the termination of payments upon new federal legislation. Appellants did not want to alienate the homeowners' associations because they did not want to lose subscribers to their cable service. There was nothing in the legislation which made the performance of the contracts illegal or impossible for appellants. The use of this legislation as a reason for non-payment was an intentional misrepresentation made for the sole purpose of saving appellants money. Appellants then ceased performance on the contracts to the homeowners' associations by stopping their rightful payments.

A review of the record establishes there was ample evidence to support the complained of findings. The evidence is both legally and factually sufficient. Point of error seven is overruled.

In points of error three and five, appellants allege appellees are not entitled to recover punitive or exemplary damages. Appellants contend appellees failed to plead or prove a distinct tortious injury distinct from the alleged breach of contract. They correctly state that punitive damages are not, as a general rule, recoverable for breach of contract. *See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493 (Tex.1991). Since appellees claims are allegedly only causes of action founded in contract, appellants assert there is no legally sufficient evidence to support the jury's findings that appellants' misrepresentation and breach of the duty of good faith and fair dealing proximately caused appellees' damages.

As previously discussed when reviewing a no evidence complaint, we consider only the evidence and inferences tending to support the jury's findings and disregard all evidence and inferences to the contrary in order to determine if any evidence of probative force supports the jury's findings. *Best,* 786 S.W.2d at 671; *Responsive Terminal Sys., Inc.,* 774 S.W.2d at 668. Although punitive damages are generally not recoverable for a breach of contract, "a tort may grow out of, be made a part of, or be coincidental with a breach of contract thereby permitting the recovery of exemplary damages if committed willfully and maliciously." *Wilson v. Donze,* 692 S.W.2d 734, 740 (Tex.App.—Fort Worth 1985, no writ) (citing *McDonough v. Zamora,* 338 S.W.2d 507, 514 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.)). "A breach of confidence may be a breach of contract as well as a tort," *Id.* (citing *Crutcher–Rolfs–Cummings, Inc. v. Ballard,* 540 S.W.2d 380 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977)). Further, the tort and the breach of

contract do not have to "arise out of separate and distinct transactions" in order to support an award of exemplary damages. *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 907 (Tex.App.—Texarkana 1987, no writ).

Appellees plead the torts of breach of the duty of good faith and fair dealing due to the special relationship between the parties, fraud based on misrepresentations made by the appellants, and tortious interference. The evidence is clear that after appellants achieved near optimum saturation of the cable television market in these subdivisions, Daley decided the $300,-000 in payments to the homeowners' associations was an expense he could eliminate. He consulted various employees and attorneys to find some excuse to get out of paying the contracts. The reason given to the homeowners' associations for the termination of payments was false. Instead of dealing honestly with appellees, appellants hid behind the "badge of authority" of an inapplicable law in an effort to keep their cable subscriptions with the homeowners and prevent the homeowners' associations from discovering appellants had breached the contracts. Appellants wanted to avoid an "onslaught of litigation" from the homeowners' associations. This effort was successful since the cancellation of subscriptions was negligible, and only 17 of the approximately 150 homeowners' associations discovered the truth and brought suit.

The termination of payments under the contracts is an intentional breach of appellants' contractual obligation to the homeowners' association. This breach, when accompanied by appellants' consciously indifferent misrepresentations of the law, and their reason for terminating the payments is a tort. *See id.* Appellees put on sufficient evidence of their actual damages, and "the fact that damages are 'economic' does not mean that they may not be damages for the tort." *See American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex.1990). Such economic damages in tort will support the award of punitive damages to appellees.

Although unnecessary to support the award of punitive damages in this case, the jury also found the existence of a special relationship between appellants and appellees, and that appellants had breached their duty of good faith and fair dealing to appellees. Generally, the special relationship creating a duty of good faith and fair dealing is found between an insurance company and its insured, *See Aranda v. Insurance Co. of N.Am.*, 748 S.W.2d 210 (Tex. 1988); *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex.1987), and Texas courts have been reluctant to extend this duty to other contractual relationships. *See Crim Truck & Tractor Co. v. Navistar Int'l Trans. Corp.*, 823 S.W.2d 591, 593–94 (Tex.1992); *Day & Zimmerman, Inc. v. Hartridge*, 831 S.W.2d 65, 71 (Tex.App.—Texarkana 1992, no writ); *Crowder v. Tri–C Resources, Inc.*, 821 S.W.2d 393, 398–99 (Tex.App.—Houston [1st Dist.] 1991, no writ). However, in this case it appears the fact that appellants are in the nature of a public service company and owe their customers a public duty in addition to the usual contractual duties owed to appellees, would support finding such a duty. *See Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962); *Southwestern Gas & Elec. Co. v. Stanley*, 123 Tex. 157, 70 S.W.2d 413, 415 (Tex.1934). There is ample evidence to support the jury's findings and award of punitive damages. Points of error three and five are overruled.

In points of error eight and nine, appellants allege the awards of prejudgment and post-judgment interest are wrong. Appellants contend appellees are entitled to prejudgment interest at only the statutory six percent per annum simple interest rate and not the rate of ten percent per annum compounded daily awarded by the trial court. *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987). Further, the trial court awarded post-judgment interest at a floating rate to be "adjusted monthly," and appellants argue the correct rate is ten percent compounded annually.

For the ten percent prejudgment interest rate awarded by the trial court to be proper, the amount of damages must not be ascertainable from the face of the

contract. *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 930–31 (Tex.1988). Otherwise, article 5069–1.03 limits the rate of prejudgment interest, for contracts, which are silent on the issue of prejudgment interest, to "six percent per annum ... allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable." TEX.REV.CIV. STAT.ANN. art. 5069–1.03 (Vernon 1987).

During the trial various experts were called to make projections on the monies due under the contracts. Appellants' attorney objected when appellees' expert stated the numbers were not really in question. Several different formulas and methods for calculating the amounts due were presented at trial. Some contracts did not specify amounts, some appellees had no written contract, and some contracts had no term. Appellants stressed these facts in their motion for new trial and gave the impression that the amount due, if ascertainable at all, would be difficult to determine. There was not an amount ascertainable from the face of the contracts as required for the statutory interest rate to apply. *Perry Roofing Co.,* 744 S.W.2d at 930. *See Rio Grande Land & Cattle Co. v. Light,* 758 S.W.2d 747, 748 (Tex.1988). Therefore, the award of prejudgment interest at ten percent compounded daily was proper.

██ As to appellants complaint about the award of post-judgment interest, it was not raised in the trial court. In order to preserve error for appeal, appellants must have asserted a valid specific complaint by the appropriate motion, objection or request in the trial court. *Jones v. LaFargue,* 758 S.W.2d 320, 324 (Tex.App.— Houston [14th Dist.] 1988, writ denied). *See* TEX.R.APP.P. 52(a). Appellants' complaint on the award of post-judgment interest was not preserved and cannot be raised on appeal. Points of error eight and nine are overruled.

The judgment of the trial court is affirmed.