# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00025-CV

**Marcia McKeehan, Individually and as Independent Executor of the Estate of W. Dale McKeehan; and Allison Schirmer, Appellants**

**v.**

**Mark Cameron McKeehan and Robin Leigh Mullenix, Appellees**

### FROM PROBATE COURT NO. 1 OF TRAVIS COUNTY
### NO. C-1-PB-10-000056, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

## O P I N I O N

Three weeks prior to his death, Dale McKeehan and his wife, appellant Marcia McKeehan, executed a change request form to add her as joint owner of his interest in Ford Motor Credit Company's Ford Interest Advantage investment program. In subsequent probate court proceedings regarding his estate, Dale McKeehan's children from a previous marriage, appellees Mark Cameron McKeehan and Robin Leigh Mullenix, successfully argued in a cross-motion for summary judgment that Marcia McKeehan's joint ownership of the Ford investment held no survivorship rights under Texas law, and thus, the Ford investment should pass to Dale McKeehan's testamentary beneficiaries as part of his probate estate. Because we hold that the Ford investment program is subject to a valid choice-of-law provision requiring that Michigan law be used to govern and construe the Ford investment program, and because under Michigan law Marcia McKeehan and Dale McKeehan held the Ford investment as joint tenants with

right of survivorship, we will reverse the trial court's summary judgment and render judgment that ownership of the Ford investment passed to Marcia McKeehan as the surviving joint owner.

## FACTUAL AND PROCEDURAL BACKGROUND

Dale[1] worked for Ford Motor Company for more than 35 years, having started at Ford in 1962 as a trainee foreman at Ford's Dallas automotive assembly plant. He retired in 1998 as vice-president of Ford's Vehicle Operations in Michigan. In 1988, while living in Michigan, Dale opened an individual account in what was then a relatively new Ford Credit Company investment program known at that time as the Ford Money Market Account.[2] Participants in the Ford investment program purchased Ford Credit debt securities—i.e., variable denomination floating rate demand notes—that earned the participants interest on their investment. Dale maintained his investment in the Ford investment program through his death in 2008.

In 1998, the same year he retired from Ford, Dale and Marcia married and moved to Texas. Ten years later, in early 2008, Dale was diagnosed with incurable non-small-cell lung cancer, which his doctors told him was a terminal condition. Marcia testified that soon after receiving this diagnosis, Dale spent a weekend reviewing his personal affairs and then made an appointment to meet with his banker, Jeff Bedell, at an Austin Comerica bank branch on February 19, 2008. Both

---

[1] Because the decedent and two of the parties here share the same surname, we will refer to the decedent and the parties by their first names to avoid confusion.

[2] In 2005, pursuant to a settlement with the Securities and Exchange Commission related to various alleged violations of the Securities Act of 1933, Ford Credit changed the name of the program to Ford Interest Advantage. *See In re Ford Motor Credit Co.*, Securities Act of 1933 Release No. 8582, Administrative Proceeding File No. 3-11950 (June 15, 2005). Except where context requires more specificity, we will refer to both interchangeably as the Ford investment program.

2

Bedell and Marcia, who also attended the meeting at Comerica, testified that Dale brought his Ford investment program information to the meeting and told Bedell that he wanted to make Marcia a joint owner of the Ford investment. Bedell called Northern Trust, the bank that administered the Ford investment program, to inform them that Dale wanted to add Marcia as a joint owner. After speaking with Dale, who confirmed his intention to add Marcia as joint owner, the Northern Trust representative faxed a "Ford Interest Advantage Change Request Form" to Bedell. Bedell filled out part of the form and then handed it to Dale, who, according to both Bedell and Marcia, reviewed the form carefully and then handed it to Marcia to add her personal information. Dale reviewed the form again, signed at the bottom, and handed it to Marcia for her signature. Bedell also signed the form as witness to the McKeehans' signatures. According to Bedell, the completed form was then returned to Northern Trust.

Dale died on March 9, 2008. In his will, Dale left all his property to a revocable trust. The trust agreement creating Dale's revocable trust directs the trustee to, stated generally, distribute the trust assets in the following order upon Dale's death:

1.  All real property, all death benefits paid by Ford, all death and pension benefits paid as a result of his employment with Ford, and $2,500,000 to Marcia;

2.  $200,000 to the Allison Schirmer Education Trust;[3] and

3.  After the payment of debts, expenses, and taxes, the remainder of the trust property, if any, to the "Child's Trusts" of Mark McKeehan and Robin Leigh Mullenix in equal shares.

---

[3] Allison Schirmer, co-appellant here, is Marcia's daughter from a previous marriage, and thus, Dale's stepdaughter.

3

Dale's will was admitted to probate, and Marcia was appointed executor pursuant to Dale's will. Meanwhile, Marcia, treating the Ford investment as a non-probate asset, informed Ford Credit that Dale had died and asked them to disburse the funds to her as the surviving owner and close the account, which Ford did.

Mark and Robin filed a petition for declaratory judgment in the probate matter, arguing, in part, that Dale's investment in the Ford investment program should be included in Dale's probate assets because, under Texas law, Marcia did not have survivorship rights to that property. The parties filed competing traditional motions for summary judgment. Mark and Robin argued that Marcia's status as joint owner did not include a right of survivorship under Texas law. Marcia argued that she held the Ford investment as a joint tenant with right of survivorship under Texas law and, further, that the Ford investment program was subject to a Michigan choice-of-law provision and Michigan law presumes survivorship rights when spouses are joint owners of an asset such as the Ford investment. The probate court denied Marcia's motion and granted Mark and Robin's motion, holding that Texas law controls the disposition of Dale's personal property and that, because Marcia did not prove that Dale signed a written agreement establishing that Marcia held survivorship rights in the Ford investment, the investment was subject to disposition as part of Dale's probate estate.

On appeal, Marcia challenges the trial court's summary judgment, asserting that the probate court erred in refusing to enforce the Michigan choice-of-law provision in the Ford investment program documents. In her second issue, she argues that, under Michigan law, she became the sole owner of the Ford investment on Dale's death because Michigan law presumes a right of survivorship to assets of this type that are jointly owned by spouses. In a third issue, Marcia

4

asserts that even if Texas law controls the disposition of the Ford investment, the probate court's summary judgment was erroneous because the change of ownership form signed by Dale and Marcia created a valid right-of-survivorship agreement under Texas law.

**DISCUSSION**

### Standard of review

To be entitled to summary judgment, the movant must establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). In our de novo review of a summary judgment, we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When, as here, both parties move for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the trial court should have rendered. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). Thus, if the trial court erred, we will reverse and render the judgment that the court should have rendered. *Id.*

### Choice of law

We first consider which jurisdiction's law—Michigan or Texas—we must apply in determining the ownership status of the Ford investment. Marcia asserts that we must use Michigan law to construe the status of the Ford investment because the summary-judgment evidence conclusively proves that the Ford investment program is subject to a Michigan choice-of-law provision. Specifically, Marcia points to a provision in a document titled "Ford Interest Advantage

5

Terms and Conditions" (Terms and Conditions), which states that "[t]he [Ford investment] Program shall be governed by and construed in accordance with the laws of the State of Michigan." In response, Mark and Robin argue that the law of the decedent's domicile—i.e., Texas—must govern the passage of that decedent's personal property and, regardless, that Marcia produced no evidence showing that Dale agreed to be bound by the Terms and Conditions.

When a party contends that a contractual choice-of-law provision requires us to apply the law of some other jurisdiction, we must first determine if the applicable laws of the two jurisdictions differ. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984). If there is no conflict in the law, there is no need to determine which law applies. *See id.* Here, there is no dispute that Michigan and Texas law differ in their treatment of the jointly-owned asset at issue. Michigan law presumes that when a husband and wife are joint owners of an asset such as the Ford investment, they hold that interest as joint tenants with right of survivorship. *See* Mich. Comp. L. § 557.151 (2010) (providing that "promissory notes, debentures, or other evidences of indebtedness" payable to spouses are held in joint tenancy). In contrast, Texas law presumes that, unless specifically indicated in writing, joint ownership of an asset does not include a right of survivorship. *See* Tex. Prob. Code Ann. §§ 46(a) (joint tenancies), 439(a) (right of survivorship) (West 2003).

Because these laws conflict, our next step would ordinarily be to decide whether the contractual choice-of-law provision at issue is enforceable. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677-81 (Tex. 1990). Here, however, Mark and Robin argue that because Marcia's summary-judgment evidence does not show that Dale ever agreed to be bound by the Terms and Conditions, the Michigan choice-of-law provision in the Terms and Conditions is not applicable

to Dale's Ford investment. We disagree because the summary-judgment evidence conclusively shows that Dale, by participating in the Ford investment program, agreed to be bound by its Terms and Conditions.

Marcia's summary-judgment evidence on this issue consisted of the following:

- Affidavits of Marcia McKeehan, Jeff Bedell (Comerica Austin bank branch manager), and Stephen Kirsch (Ford Credit representative);

- "Ford Interest Advantage" statements, dated February 1, 2008, through December 31, 2008);

- "Ford Interest Advantage" program applications (two versions, both blank);

- "Ford Interest Advantage Change Request Form," dated February 19, 2008;

- Ford investment program prospectus, titled "Ford Motor Credit Company $250,000,000 VARIABLE DENOMINATION FLOATING RATE DEMAND NOTES, *Offered as set forth herein pursuant to* FORD MONEY MARKET ACCOUNT," and dated November 25, 1987 (Prospectus);

- "Indenture," between Ford Motor Credit Company and the Bank of New York, dated July 1, 1985; "First Supplemental Indenture," dated November 15, 1987; "Second Supplemental Indenture," dated October 15, 1988; "Third Supplemental Indenture," dated March 1, 1996; "Fourth Supplemental Indenture," dated March 1, 1998; "Fifth Supplemental Indenture," dated February 1, 2000; "Sixth Supplemental Indenture," dated August 27, 2003; "Seventh Supplemental Indenture," dated July 5, 2005 (current Indenture); and

- "Ford Interest Advantage Terms and Conditions," dated September 27, 2007.

This evidence establishes, and Mark and Robin do not dispute, that Dale enrolled in the Ford investment program in 1988 and participated continuously in that program until his death in March 2008. Ford's representative Stephen Kirsch testified that when Dale enrolled in the Ford investment program in 1988, Dale would have had to submit an application to Ford Credit, but that application has since been lost. The lack of his original application is not dispositive

here, however, because other summary-judgment evidence establishes what Dale and the other investors' rights and obligations were under the Ford investment program. *See Houston Cable TV, Inc. v. Inwood West Civic Ass'n, Inc.*, 839 S.W.2d 497, 503 (Tex. App.—Houston [14th Dist.] 1992), *judg't set aside*, *opinion not vacated by* 860 S.W.2d 72 (Tex. 1993) (holding that fact that contract was lost does not negate parties' rights and obligations under that agreement because contract itself is merely evidence of rights and obligations).[4]

That other summary-judgment evidence includes the original and 2005 indentures, the Terms and Conditions, and the Prospectus, all of which Kirsch testified were prepared by Ford Credit as part of the Ford investment program and filed with the Securities and Exchange Commission pursuant to federal securities law. The purpose of the Prospectus, according to Kirsch, was to explain the nature of the Ford investment program so that the person making the investment was fully informed regarding the investment. The Prospectus discloses that Ford Credit was issuing demand notes pursuant to an investment plan adopted by its board of directors, designated as the "Ford Money Market Account Plan" or "Plan," and explains that the prospectus itself was a summary of the "Plan." Although the "Plan" referred to in the prospectus is not included in Marcia's summary-judgment evidence, the following excerpts from the Prospectus show that the "Plan" was

---

[4] After the Houston court of appeals issued its opinion in this matter, Houston Cable TV, Inc. filed an application for writ of error to the supreme court. *See Houston Cable TV, Inc. v. Inwood West Civic Ass'n, Inc.*, 860 S.W.2d 72 (Tex. 1993). The parties subsequently settled and then, pursuant to settlement, filed a joint motion asking the supreme court to grant its writ, vacate the judgment and opinion of the court of appeals, and vacate the trial court's judgment. *Id.* The supreme court, noting that "a private agreement between litigants should not operate to vacate a court's writing on matters of public importance," refused to vacate and indicated that the precedential authority of the court of appeals' opinion is equivalent to a "writ dismissed" case. *Id.*

the document or agreement setting forth the provisions of the Ford investment program, including

investors' rights and limitations when enrolled in the investment program:

> The Variable Denomination Floating Rate Demand Notes . . . are being issued and offered by [Ford Credit] pursuant to an investment plan *adopted* by the Board of Directors of [Ford Credit] and *designated* as the Ford Money Market Account Plan (hereinafter called "Ford Money Market Account" or the "Plan"). Investments by an investor pursuant to the Plan will be used to purchase a Note.
>
> . . . .
>
> *Rights* of investors under the Plan, and the *limitations on such rights*, together with the principal *provisions* of the Plan, are summarized in the next few pages. This summary is subject to the *detailed provisions* of the Plan, which are controlling. A *copy of the Plan* is filed as an exhibit to the Registration Statement of which this Prospectus is a part. A copy of the Plan will be made available to an investor upon written or oral request.

(Emphases added.)

The Indenture was the agreement between Ford Credit and the Bank of New York, as trustee, regarding Ford Credit's issuance of demand notes pursuant to the Ford investment program.[5] Generally stated, the Indenture sets forth the terms and conditions governing Ford Credit's issuance of the demand notes, including limiting the total aggregate amount of notes issued to $250 million, establishing the form of the actual notes, defining Ford Credit's obligations under the notes, and delineating the trustee's duties. The Indenture also establishes certain rights and remedies for holders of the Ford notes, including requiring that the notes be issued in accordance

---

[5] The Trust Indenture Act of 1939 applies to securities—e.g., bonds, debentures, and notes—that are offered for public sale. *See* 15 U.S.C. § 77aaa-77bbbb (West 2010). Although such securities may be registered under the Securities Act, they may not be offered for sale to the public unless a formal agreement between the issuer of the bonds and the bondholder, known as the trust indenture, conforms to the standards of the Trust Indenture Act. *See id*.

with the terms of the "Ford Money Market Account Plan" or "Plan" and its provisions. And like the Prospectus, the Indenture's references to the "Plan" indicate that the "Plan" is the agreement between Ford Credit and its investors regarding the investors' rights and limitations under the Ford investment program. The following are some examples of the Indenture's references to the "Plan":

> The Notes shall be designated as Variable Denomination Floating Rate Demand Notes and shall be issued in accordance with the Plan, the *provisions of which are incorporated herein by reference and made a part hereof.*
>
> . . . .
>
> The term "Note" or "Notes" shall mean any Note or Notes, as the case may be, issued pursuant to the Plan and authenticated and delivered under this Indenture.
>
> . . . .
>
> The term "Plan" shall mean the Ford Money Market Account Plan established by [Ford Credit] and in effect on the date hereof, as *amended or supplemented* from time to time.
>
> . . . .
>
> The Notes . . . shall bear interest from and after [the date on which the investor's account is first credited] in accordance with the *provisions* of the Plan.
>
> . . . .
>
> Subject to the *provisions* of the Plan, the Notes are not transferable, in whole or in part, either directly or by operation of law or otherwise.
>
> . . . .
>
> The Notes shall be subject to redemption by [Ford Credit] . . . in the event that [Ford Credit] shall terminate, suspend or discontinue the Plan at any time after the date hereof *as provided* in the Plan.
>
> . . . .

10

Subject to the *provisions* of the Plan, [Ford Credit], the Trustee, and the Agent Bank or any other paying agent may deem and treat the person in whose name any Note shall be registered upon the Note Register as the absolute owner of such Note . . . .

. . . .

[Ford Credit] . . . and the Trustee may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes: . . . (g) to modify, amend or supplement this Indenture in such a manner as to reflect any *termination, suspension or modification* of the Plan as permitted hereunder.

. . . .

(Emphases added.)

Similarly, the actual notes issued by Ford Credit to its investors under the Ford investment program, as provided by the Indenture, include the following references to the "Plan":

[Ford Credit] . . . for value received, hereby promises to pay to [holder] the aggregate unpaid principal amount . . . shown on the books and records of [Ford Credit] maintained by the . . . Agent Bank . . . for [Ford Credit] under the Ford Money Market Account Plan (the "Plan"), and . . . to pay interest on the Principal Balance, at a rate per annum from time to time determined *pursuant to the Plan*.

Accrued interest . . . shall be payable in whole on demand by the holder of this Note at any time after the date hereof *in accordance with the provisions* of the Plan.

Payment of the Principal Balance and accrued and unpaid interest of this Note will be made to the person whose name is set forth above, or in accordance with the instructions of such person given *in accordance with provisions of the Plan* . . . .

SUBJECT TO THE *TERMS AND CONDITIONS OF THE PLAN* THIS NOTE IS NOT ASSIGNABLE OR TRANSFERABLE . . . .

11

In sum, Kirsch's testimony and the other summary-judgment evidence establish that Dale participated in the Ford investment program continuously from 1988 through his death in 2008. The evidence also establishes that the governing documents for the Ford investment program—i.e., the documents that set forth the terms, conditions, rules, rights, and obligations of all the persons or entities involved in the program—included the Indenture, the Prospectus, the notes, and the "Plan." The Prospectus, the Indenture, and the notes—again, documents that were filed with the SEC as part of the Ford investment program and that were in effect when Dale enrolled in the program in 1988—establish in turn that the "Plan" was the governing Ford program document that defined its investors' rights and limitations under the program. Thus, regardless of the fact that Dale's initial application was lost, the summary-judgment evidence conclusively establishes that Dale's participation in the investment program was subject to the rights and obligations set forth in the "Plan." *See Houston Cable TV*, 839 S.W.2d at 503.

In July 2005, Ford Credit modified the "Plan" and various other aspects of the Ford investment program pursuant to the Seventh Supplemental Indenture.[6] Most notably, this supplemental indenture changed the name of the Ford investment program from "Ford Money Market Account" to "Ford Interest Advantage." It also changed the name of the "Plan" from "Ford Money Market Account Plan" to "Ford Interest Advantage Terms and Conditions," and replaced the word "Plan" in the original Indenture with "Terms and Conditions":

> WHEREAS, [Ford Credit] has made modifications to the Plan (as defined in the Original Indenture) to change the name of the "Ford Money Market Account Plan"

---

[6] The first through sixth supplemental indentures modified or supplemented the Indenture in ways that are not relevant to this suit.

to "Ford Interest Advantage Terms and Conditions[,]" to change the name under which the Notes are offered from "Ford Money Market Account" to "Ford Interest Advantage[,]" and to provide for the issuance of Notes in global form:

. . . .

*Terms and Conditions*:

The term "Terms and Conditions" shall mean the Ford Interest Advantage Terms and Conditions established by [Ford Credit], as amended or supplemented from time to time.

. . . .

Change of Name: Effective on the date of this Seventh Supplemental Indenture, with respect to Notes issued on or after the date of this Seventh Supplemental Indenture, all references in the Indenture to "Ford Money Market Account," "Plan Balance" and "Ford Money Market Account Plan" are hereby replaced by "Ford Interest Advantage," "Program Balance" and "Ford Interest Advantage Terms and Conditions," respectively. Additionally, with respect to the Notes issued on or after the date hereof, the definition for the term "Plan" shall be deleted from . . . the Indenture, and all references to the defined term "Plan" in the Indenture shall be replaced with references to the defined term "Terms and Conditions.". . .

The Terms and Conditions referred to in the Seventh Supplemental Indenture were attached as summary-judgment evidence and include, in addition to the Michigan choice-of-law provision, the following:

FORD INTEREST ADVANTAGE
TERMS AND CONDITIONS

The Ford Interest Advantage Terms and Conditions ("Ford Interest Advantage" or the "Program") has been established by Ford Motor Credit Company to provide investors with a convenient means of making investments in floating rate demand notes of Ford Motor Credit Company.

. . . .

13

Each Participating Investor shall, upon request, be given a copy of the Program as in effect at the time, and by participating shall be deemed to accept and agree to all the provisions of the Program.

Thus, the "Plan" was replaced by the Terms and Conditions—i.e., Dale's rights and obligations under the Ford investment program are now governed by the Terms and Conditions. Further, based on the participation provision quoted above, Dale's continued participation in the Ford investment program after 2007, when the Terms and Conditions appear to have been adopted, bound him to the Terms and Conditions. In sum, the summary-evidence conclusively establishes that Dale's investment in the Ford investment program was bound by the program's Terms and Conditions, including its Michigan choice-of-law provision.

Before we apply Michigan law to the issue here, however, we must determine whether the Terms and Conditions' choice-of-law provision is enforceable under section 187 of the Restatement (Second) of Conflict of Laws. *See DeSantis*, 793 S.W.2d at 677 (holding that, with certain limitations, parties to contract have right to include choice of law provision in contract, and applying Restatement section 187 to determine if parties' choice-of-law provision is within those limitations). Restatement section 187 provides as follows:

Law of the State Chosen by the Parties

(1)     The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2)     The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

14

(a)    the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b)    application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3)    In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement (Second) of Conflict of Laws § 187 (1971) (Restatement). Thus, whether a choice-of-law provision is enforceable depends initially on whether the issue in dispute is one that the parties could have resolved by including an explicit provision in their contract. *Id.*; *see DeSantis*, 793 S.W.2d at 678. Some examples of issues that cannot be resolved by contractual choice-of-law provisions include capacity, enforceability, formalities, and validity. *See* Restatement § 187 cmt. d; *DeSantis*, 793 S.W.2d at 678. Issues that can be resolved include construction, conditions precedent and subsequent, and performance. *See* Restatement § 187 cmt. c; *DeSantis*, 793 S.W.2d at 678.

The issue before us—i.e., the ownership status of a jointly-owned investment in the Ford investment program—is "one which the parties could have resolved by an explicit provision in their agreement." *See* Restatement cmt. c; *see also DeSantis*, 793 S.W.2d at 678 (applying section 187(2) because enforceability of contract is not issue that parties could have resolved by explicit provision). This is most clearly illustrated by the fact that the current and more recent versions of the Ford investment program application, which Kirsch produced in his deposition and which are part of the summary-judgment evidence, include explicit language defining the scope of

15

joint ownership—e.g., "Joint Owner (A joint tenancy with right of survivorship will be presumed unless otherwise indicated.)"[7] Also, Texas law allows parties to create a joint tenancy with right of survivorship. *See* Tex. Prob. Code Ann. § 46(a), 439(a). Accordingly, under Restatement section 187(1), we should apply Michigan law to this issue. *See DeSantis*, 793 S.W.2d at 677-78.

Mark and Robin argue that the Michigan choice-of-law provision is not valid because it conflicts with Texas's public policy against rights of survivorship. *See* Restatement § 187(2). We do not necessarily agree that a Michigan law that presumes that spouses who are joint owners of an asset hold survivorship rights in that asset violates Texas public policy,[8] but even if we did, the public-policy test in section 187(2) is triggered only if the issue to be resolved could not have been resolved by an explicit provision in the parties' agreement. *See id*. § 187 cmt. d; *Nexen Inc. v. Gulf Interstate Eng'g Co.*, 224 S.W.3d 412, 420 (Tex. App.—Houston [1st Dist.] 2006, no pet.). As discussed above, the issue here could have been resolved by including a specific provision in a Ford investment program document—e.g., the application—delineating the survivorship rights of joint owners. Thus, we need not reach the public-policy test described in Restatement section 187(2). Even if we did, however, the public-policy test is applied between the law of the

---

[7] Given Kirsch's testimony that Dale's application would have been the same type as the current application, it is likely that his application included a similar provision.

[8] Although Texas law presumes that joint tenants do not hold survivorship rights absent a writing to that effect, Texas law does not prohibit joint tenancies with right of survivorship. *See* Tex. Prob. Code Ann. § 46(a) (West 2003) ("[J]oint owners may agree in writing . . . that the interest of any joint owner who dies shall survive to the surviving joint owner, but no such agreement shall be inferred from the mere fact that the property is held in joint ownership."). Nor does Texas law prohibit spouses from creating survivorship rights to community property. *See id.* § 451 (West 2003) ("[S]pouses may agree between themselves that all or part of their community property . . . becomes the property of the surviving spouse on the death of a spouse.").

"chosen state"—here, Michigan—and a state that has "a materially greater interest than the chosen state in the determination of the particular issue," and "which, under the rule of section 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement § 187(2). Applying the section 188 factors, Michigan was the place of contracting—i.e., where Dale enrolled in the program in 1988—the place of negotiation of the contract, the place where at least part of the contract was performed, the location of, at least in part, the subject matter of the contract, and is Ford Credit's place of business. *See id.* § 188 (listing factors to be considered when determining law applicable to issue in absence of choice-of-law provision). We cannot say under these factors that Texas would be the state of the applicable law.

Mark and Robin also argue that the choice-of-law provision in the Terms and Conditions applies only to the administration of the Ford investment program and not to the beneficial ownership of the Ford investment program assets. We disagree. The Terms and Conditions provides that "[t]he Program shall be governed by and construed in accordance with the laws of the State of Michigan." The "Program," which is a short identification for the Terms and Conditions, was "established by Ford Motor Credit Company to provide investors with a convenient means of making investments in floating rate demand notes of Ford Motor Credit Company." In addition to setting forth administrative rules and procedures for the Ford investment program, the Terms and Conditions provides, for example, the interest to be paid on the investments, the types of investments that can be created by an investor, and how and under what conditions investors may redeem their investments. In fact, one provision regarding establishment of a program investment states that "an investor may establish and maintain one or more of the following types of

17

investments: individual investments, joint investment, . . . ." Thus, the "Program" covers all aspects of the Ford investment program, including ownership status.

Finally, Mark and Robin argue that "passage of title to personal property of decedents domiciled in Texas is governed by Texas law."[9]  Although we do not disagree generally with that statement of the law, their reliance on it here is misplaced.  Before we can determine passage of title to this property, whether pursuant to Texas law or the directions of the decedent, we must first answer the threshold questions regarding the nature of the property itself, such as who owned the Ford investment and how.  As was discussed above, the answers to those questions must be determined pursuant to Michigan law because Dale and Ford Credit chose to have the Ford investment program governed and construed pursuant to Michigan law.  Once the questions as to the nature of the property are answered, we can then apply Texas law to determine the proper disposition of the property.

We hold that the summary-judgment evidence conclusively established that Dale's ownership in the Ford investment program is governed by and must be construed according to Michigan law.  We sustain Marcia's first issue.

---

[9]  They cite to the following cases in support of their argument:  *King v. Bruce*, 201 S.W.2d 803 (Tex. 1947); *Saner-Ragley Lumber Co. v. Spivey*, 238 S.W. 912 (Tex. Comm'n App. 1930); *In re Estates of Garcia-Chapa*, 33 S.W.3d 859 (Tex. App.—Corpus Christi 2000, no pet.); *Ramirez v. Lagunes*, 794 S.W.2d 501 (Tex. App.—Corpus Christi 1990, no writ); *Ossorio v. Leon*, 705 S.W.2d 219 (Tex. App.—San Antonio 1985, no writ); *Van Hoose v. Moore*, 441 S.W.2d 597 (Tex. Civ. App.—Amarillo 1969, writ ref'd n.r.e.); Restatement (Second) of Conflict of Laws §§ 6, 260, 263 (1971).

***Michigan law***

In her second issue, Marcia asserts that she was entitled to summary judgment on her claim that she is the sole owner of the Ford investment because under Michigan law she and Dale held ownership of the Ford investment as joint tenants with right of survivorship. We agree.

Michigan law provides that—

> All bonds, certificates of stock, mortgages, promissory notes, debentures, or other evidences of indebtedness hereafter made payable to persons who are husband and wife, or made payable to them as endorsees or assignees, or otherwise, shall be held by such husband and wife in joint tenancy unless otherwise therein expressly provided, in the same manner and subject to the same restrictions, consequences and conditions as are incident to the ownership of real estate held jointly by husband and wife under the laws of this state, with full right of ownership by survivorship in case of the death of either.

Mich. Comp. L. § 557.151 (2010).

The summary-judgment evidence establishes that (1) Dale's investment in the Ford investment program is an interest in Ford promissory notes, (2) Dale's interest in the Ford investment program, as a result of the change-request form executed on February 19, 2008, was payable to Dale and Marcia, and (3) Dale and Marcia were husband and wife. Thus, under Michigan law, Dale and Marcia owned the Ford investment as joint tenants with right of survivorship. Accordingly, when Dale died, ownership of the Ford investment passed to Marcia as the surviving owner. *See Holmes v. Beatty*, 290 S.W.3d 852, 857 (Tex. 2009) (citing *U.S. v. Craft*, 535 U.S. 274, 280 (2002)) ("Upon the death of one joint tenant, that tenant's share in the property does not pass through will or the rules of intestate succession; rather, the remaining tenant or tenants automatically inherit it.").

Mark and Robin argue that there is a question of fact regarding whether the change request form signed by Dale and Marcia to make her a joint owner of the investment was "properly executed, delivered, and received by Northern Trust." Specifically, Mark and Robin point to documents in evidence showing that, although the change request form was signed on February 19, 2008, Ford Credit's records showed Dale as the only owner of the investment as of March 9, 2008—i.e., the date of Dale's death. They argue that because "ownership passes at death," the ownership could not have "legitimately been changed to a joint account" after Dale's death, and an "individual account" cannot pass by right of survivorship. We disagree with Mark and Robin's premise that Dale was the individual owner of the investment before Ford Credit administratively effected the clerical changes necessary to implement Dale's request to make Marcia a joint owner.

Although the evidence shows that Ford Credit listed the investment only in Dale's name as of the date of his death, the evidence also shows that Dale wanted Marcia added as a joint owner and, to effect that wish, he completed the required change request form on February 19, 2008, pursuant to Ford's instructions. Specifically, Bedell and Marcia testified that Dale and Marcia, with Bedell as witness, signed the change request form on February 19, 2008. Bedell also testified that the completed change request form was returned to Northern Trust. The form itself, which is dated "2-19-08," provides that the currently registered owner must sign the form "to authorize and *initiate* any elections or selections" made on the form and also that the "authorization will *remain* in full force until [the registered owner] notifie[s] . . . [the agent bank] in writing to cancel it." (Emphasis added.) "Initiate" means "to begin or set going." *Webster's Third New Int'l Dictionary* 1164 (2002). Thus, under the plain language of the change request form, Dale's signature on the change request form authorized and "began" the election, and that election "remained" in effect until

20

cancelled in writing. The fact that Northern Trust or Ford Credit did not administratively effect the clerical change of ownership until a later date does not create a fact issue regarding whether Dale authorized the change or when that change took effect.

Finally, Mark and Robin assert that there is a fact issue regarding Dale's mental capacity to enter into a contract—i.e., the change request form. Specifically, Mark and Robin argue that their summary-judgment evidence "contradicts Marcia's evidence that Dale was in full control of his faculties and raises the issue of whether he had contractual capacity." We disagree.

Texas law has long presumed that a party to a contract has the mental capacity to enter into the contract. *See Swink v. City of Dallas*, 36 S.W.2d 222, 224 (Tex. Comm'n App. 1931, holding approved); *Denny v. Stokes*, 72 S.W. 209 (Tex. Civ. App.—Houston 1903, no writ). The fact that a party raises the issue of incompetence does not, alone, obligate the summary-judgment movant to prove mental competence or disprove the possibility of incompetence. *See Estate of Galland v. Rosenberg*, 630 S.W.2d 294, 298 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). Rather, to raise a question of fact sufficient to overcome the presumption that Dale had the requisite mental capacity to complete and sign the change request form—i.e., to defeat Marcia's motion for summary judgment on the ground that Dale lacked the mental capacity to enter into a contract—Mark and Robin had to present competent summary-judgment evidence showing that Dale lacked "sufficient mind and memory at the time of execution to understand the nature and effect of [his] act." *See Temesgen v. Hochderffer*, —S.W.3d—, No. 03-09-00007-CV, 2011 Tex. App. LEXIS 4440, at *20 (Tex. App.—Austin June 10, 2011, no pet. h.) (citing *Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.); *Jackson v. Henninger*, 482 S.W.2d 323, 325 (Tex. Civ. App.—Austin 1972, no writ)); *see also Hall v. Hall*, 352 S.W.2d 765, 767

21

(Tex. Civ. App.—Houston 1962, no writ) (mental capacity to contract must be determined as of contract execution date).  Mark and Robin's summary-judgment evidence fails to do this.

As support for their contention that Dale lacked mental capacity, Mark and Robin submitted their own affidavits, which included the following testimony:

- On February 15, 2008, Dale was "practicing his signature due to partial muscle mobility loss on his right side.  He was having trouble signing his name."

- Dale underwent radiation treatment on the cancer in his brain on February 15, 2008.

- After February 15, 2008, Mark and Robin tried to speak to Dale, but "Dale was isolated by Marcia, subject to her influence and control, and his capacity was diminished."

"While circumstantial evidence may be offered to raise an issue of material fact, such evidence must transcend mere suspicion.  Evidence that is so slight as to make any inference a guess is in legal effect no evidence."  *Temesgen*, 2011 Tex. App. LEXIS 4440, at * 22 (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)) (citations omitted).  Here, the inference of mental incapacity suggested by the testimony that Dale had difficulty signing his name does not rise above mere suspicion, as that difficulty can be "explained by physical disability just as easily as mental incapacity."  *Id*.  Thus, this part of their affidavit testimony fails to raise an issue of material fact with respect to Dale's mental capacity.  *See Ford Motor Co.*, 135 S.W.3d at 601; *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984); *Temesgen*, 2011 Tex. App. LEXIS 4440, at *22-23.

Likewise, the fact that Dale underwent radiation treatment to the brain on February 15, 2008, absent medical testimony or other evidence suggesting that radiation treatment to the brain renders someone mentally incapacitated, does not give rise to the inference that he did

22

not understand the nature and effect of his actions on February 19, 2008, when he signed the change request. Even when coupled with the fact that Dale experienced difficulty signing his name after the treatment, it would be a mere guess or suspicion to infer that he was mentally incapacitated rather than just physically affected. Similarly, Marcia's alleged isolation of and control over Dale does not speak at all to Dale's mental capacity to sign the change request form on February 19, 2008.

Finally, the bare assertion in the affidavits that "Dale's capacity was diminished," does not create a fact issue regarding Dale's mental capacity to contract because it does not specify whether the nature of the diminished capacity is physical or mental capacity, and both are equally possible under the circumstances alleged. Further, even assuming that this testimony references Dale's mental capacity, it is a legal conclusion unsupported by any facts. *See Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004); *Casualty Underwriters v. Rhone*, 132 S.W.2d 97, 98-99 (Tex. 1939) (holding that "bare conclusions" are incompetent and "fact that they were admitted without objection adds nothing to their probative force"). As such, this testimony is not competent summary-judgment evidence and cannot raise an issue of fact as to Dale's capacity sufficient to defeat Marcia's motion. *See* Tex. R. Civ. P. 166a; *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (holding that legal conclusions not supported by facts will not support summary judgment); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) ("Affidavits consisting of only legal conclusions are insufficient to raise an issue of fact."). Accordingly, Mark and Robin have failed to raise an issue of material fact as to Dale's mental capacity to sign the change request form on February 19, 2008.

We hold that under Michigan law, Marcia held ownership of the Ford investment as a joint tenant with right of survivorship. Thus, when Dale died, she became the sole owner of the

23

Ford investment.  *See Holmes*, 290 S.W.3d at 857 (citing *Craft*, 535 U.S. at 280).  Accordingly, we sustain Marcia's second issue.  Because we have sustained Marcia's first and second issues, we need not address her third issue regarding application of Texas law to the Ford investment.

## CONCLUSION

Having sustained Marcia's first and second issues on appeal, we reverse the judgment of the trial court.  Having further concluded that Marcia met her burden to demonstrate that she was entitled to summary judgment on her claim for declaratory relief, we render judgment that ownership of the Ford Interest Advantage investment passed to Marcia by right of survivorship upon Dale's death.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Reversed and Rendered

Filed:   July 6, 2011

24